1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   ORI KATZ, Cal. Bar No. 209561
3  okatz@sheppardmullin.com
   J. BARRETT MARUM, Cal. Bar No. 228628
4  bmarum@sheppardmullin.com
   MICHAEL M. LAUTER, Cal. Bar No. 246048
5  mlauter@sheppardmullin.com
   Four Embarcadero Center, 17th Floor
6  San Francisco, California 94111-4109
   Telephone:   415.434.9100
7  Facsimile:   415.434.3947

8  Proposed Counsel for the Debtor,
   MedCision, LLC
9

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13  In re:                          |  Chapter 11

14  MedCision, LLC                  |  Case No. 17-31272
15      f/k/a BioCision, LLC,       |
                                    |  **SUPPLEMENTAL DECLARATION OF**
16                     Debtor.      |  **KYLE EVERETT IN SUPPORT OF**
                                    |  **DEBTOR'S APPLICATION FOR ENTRY**
17                                  |  **OF AN ORDER AUTHORIZING THE**
                                    |  **RETENTION OF KYLE EVERETT OF**
18                                  |  **DEVELOPMENT SPECIALISTS, INC.**
                                    |  **AS ITS CHIEF RESTRUCTURING**
19                                  |  **OFFICER**

20                                  |  Date:   March 22, 2018
                                    |  Time:   10:00 a.m.
21                                  |  Judge:  Hon. Hannah L. Blumenstiel
                                    |  Place:   450 Golden Gate Avenue
22                                  |           16th Floor, Courtroom 19
                                    |           San Francisco, CA  94102
23

24

25

26

27

28

                                SUPPLEMENTAL DECLARATION OF KYLE EVERETT CRO

1    I, Kyle Everett, declare:

2        1.    The facts set forth herein are personally known to me and, if called as a

3    witness, I could and would testify thereto.

4        2.    I make this declaration in support of the *Debtor's Application for Entry of an*

5    *Order Authorizing the Retention of Kyle Everett of Development Specialists, Inc. as its*

6    *Chief Restructuring Officer* (the "Application") filed on February 22, 2018 as Docket No.

7    91. Unless otherwise defined, all capitalized terms used herein have the meanings ascribed

8    thereto in the Application.

9        3.    This declaration supplements the *Declaration of Kyle Everett in Support of*

10   *Debtor's Application for Entry of an Order Authorizing the Retention of Kyle Everett of*

11   *Development Specialists, Inc. as its Chief Restructuring Officer* filed on February 22, 2018

12   as Docket No. 92.

13       4.    Attached to this declaration as <u>Exhibit A</u> is a true and correct copy of the

14   Debtor's Operating Agreement.

15       I declare under penalty of perjury under the laws of the United States of America

16   that the foregoing is true and correct. Executed on this 21ᵗʰ day of March, 2018, at

17   San Francisco, California.

18                                    _____

19                                    KYLE EVERETT

20

21

22

23

24

25

26

27

28

SMRH:485755979.1

SUPPLEMENTAL DECLARATION OF KYLE EVERETT CRO

## EXHIBIT A

**LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT**

**OF**

**BIOCISION, LLC**

**Amended and Restated as of March 12, 2014**

# TABLE OF CONTENTS

**Page**

### ARTICLE I DEFINITIONS AND CALCULATIONS

| | | |
|---|---|---|
| 1.1. | Certain Definitions | 1 |
| 1.2. | Accounting Principles | 4 |

### ARTICLE II ORGANIZATION

| | | |
|---|---|---|
| 2.1. | Certificate of Formation | 4 |
| 2.2. | Name of the Company | 5 |
| 2.3. | Place of Business | 5 |
| 2.4. | Registered Office and Registered Agent | 6 |
| 2.5. | Lack of Authority of Members | 6 |
| 2.6. | Ownership of Property | 6 |
| 2.7. | Current Members | 6 |
| 2.8. | No State Law Partnership | 6 |

### ARTICLE III PURPOSES AND POWERS OF THE COMPANY

| | | |
|---|---|---|
| 3.1. | Purpose | 6 |
| 3.2. | Powers | 6 |

### ARTICLE IV TERM OF THE COMPANY

| | | |
|---|---|---|
| 4.1. | Term | 7 |

### ARTICLE V UNITS; CAPITAL ACCOUNTS AND ALLOCATIONS

| | | |
|---|---|---|
| 5.1. | Authorized Equity; Units and Percentage Interests of Members | 7 |
| 5.2. | Issuance of Additional Units | 7 |
| 5.3. | Capital Accounts | 8 |
| 5.4. | Allocations | 8 |
| 5.5. | Dividends | 10 |
| 5.6. | Advances to the Company | 11 |
| 5.7. | Liability of Members, Directors and the Manager | 11 |
| 5.8. | Return of Capital | 11 |
| 5.9. | Distributions | 12 |
| 5.10. | Income Tax Distributions | 12 |
| 5.11. | Withholding and Payments on Behalf of a Member | 12 |
| 5.12. | Limitation Upon Distributions | 12 |

### ARTICLE VI LIQUIDATION AND CONVERSION RIGHTS OF CLASS D PREFERRED UNITS AND CLASS C COMMON UNITS

| | | |
|---|---|---|
| 6.1. | Definitions | 13 |
| 6.2. | Liquidation Rights | 14 |
| 6.3. | Class C Conversion | 18 |
| 6.4. | Class D Optional Conversion | 20 |
| 6.5. | Class D Mandatory Conversion | 30 |
| 6.6. | Redeemed or Otherwise Acquired Shares | 31 |

i

Case: 17-31272    Doc# 124    Filed: 03/21/18    Entered: 03/21/18 12:10:21    Page 5 of 81

**TABLE OF CONTENTS**

### ARTICLE VII MANAGEMENT; MEMBERS

7.1. Management by Board ................................................................................................31
7.2. No Management by Members ....................................................................................31
7.3. Directors ...................................................................................................................31
7.4. Managers under the Delaware LLC Act ...................................................................31
7.5. Powers of the Board ..................................................................................................32
7.6. Committees of the Board ...........................................................................................32
7.7. Term; Vacancies; Removal .......................................................................................33
7.8. Meetings of the Board ...............................................................................................33
7.9. Procedure ..................................................................................................................34
7.10. Voting and Quorum ...................................................................................................34
7.11. Waivers of Notice .....................................................................................................34
7.12. Compensation ...........................................................................................................34
7.13. Action by Written Consent .......................................................................................34
7.14. Manager .....................................................................................................................34
7.15. Voting Rights of Class A Members and Class D Members; Actions requiring Members' Consent; Meetings of Members ...............................................................35
7.16. Class D Preferred Units Unit Protective Provisions ................................................37
7.17. Indemnification of the Members, Directors, Managers, and any Affiliates .............40
7.18. Fiduciary Duties ........................................................................................................41
7.19. Savings Clause ..........................................................................................................41

### ARTICLE VIII ADDITIONAL AGREEMENTS AND RESTRICTIONS

8.1. Financial Statements; Other Reports ........................................................................41
8.2. Inspection and Other Information .............................................................................42
8.3. Issuance of Certificates ............................................................................................42

### ARTICLE IX BANK ACCOUNTS; BOOKS AND RECORDS; STATEMENTS; TAXES; FISCAL YEAR

9.1. Bank Accounts ..........................................................................................................43
9.2. Books and Records ....................................................................................................44
9.3. Accounting Decisions ...............................................................................................44
9.4. Where Maintained .....................................................................................................44
9.5. Tax Returns ...............................................................................................................44
9.6. Fiscal Year ................................................................................................................44

### ARTICLE X DISSOLUTION AND LIQUIDATION

10.1. Events Causing Dissolution ......................................................................................44
10.2. Cancellation of Certificate .......................................................................................45
10.3. Distributions Upon Dissolution ................................................................................45
10.4. Deficit Restoration/Liability .....................................................................................45

### ARTICLE XI MISCELLANEOUS

11.1. Specific Performance; Injunction; Payment of Costs ...............................................45

6674560_4

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 11.2. | Further Assurances | 46 |
| 11.3. | Termination; Survival | 46 |
| 11.4. | Benefits of Agreement | 46 |
| 11.5. | Enforceability | 46 |
| 11.6. | GOVERNING LAW | 46 |
| 11.7. | CONSENT TO JURISDICTION | 47 |
| 11.8. | WAIVER OF JURY TRIAL | 47 |
| 11.9. | Notices | 47 |
| 11.10. | Amendments and Waivers | 48 |
| 11.11. | Exculpation | 48 |
| 11.12. | Compliance with Delaware LLC Act | 48 |
| 11.13. | Descriptive Headings | 48 |
| 11.14. | Entire Agreement | 48 |
| 11.15. | Counterparts | 49 |
| 11.16. | Company Opportunity | 49 |

Case: 17-31272    Doc# 124    Filed: 03/21/18    Entered: 03/21/18 12:10:21    Page 7 of
81

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## AMENDED AND RESTATED AS OF MARCH 12, 2014

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF BIOCISION, LLC, a Delaware limited liability company (the "Company"), supersedes the Limited Liability Company Operating Agreement of BioCision, LLC made as of July 27, 2012 together with Amendments 1 and 2 thereto (the "Prior Agreement"), and further amends and restates the Prior Agreement in its entirety as set forth herein.

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF BIOCISION, LLC, is made as of March 12, 2014 by and among the signatories listed on the signature pages hereto (the "Signatory Members"), who together have sufficient voting power to amend the Prior Agreement, and the Company, and any other persons or entities who shall in the future execute and deliver this Agreement in the capacity of a Member (as defined in Section 1.1 hereof) pursuant to the provisions hereof.

## WITNESSETH:

WHEREAS, the Company was organized as a Delaware limited liability company pursuant to a Certificate of Formation, filed with the Secretary of State of the State of Delaware on June 27, 2008; and

WHEREAS, the Current Members and the Company desire to memorialize certain agreements relating to the operations and governance of the Company, and the rights of the holders of membership Units of the Company, on the terms and conditions set forth in this Limited Liability Company Operating Agreement (this "Agreement");

NOW, THEREFORE, in consideration of the foregoing and the covenants and obligations set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND CALCULATIONS

1.1.    Certain Definitions.  As used herein, the following terms shall have the following meanings:

"Additional Class D Investors" means Broad Oak Fund II, LLC and any of its Affiliates and Research Corporation Technologies, Inc. and any of its Affiliates.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person.  A Person shall be deemed to "control" another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such other Person, whether

through the ownership of voting securities, by contract or otherwise; provided that neither the Company nor any subsidiary of the Company shall be deemed to be an Affiliate of any Member for purposes of Section 7.17 of this Agreement.

"Board" shall mean the Board of Directors of the Company.

"Capital Account" shall mean the capital account established and maintained for each Member pursuant to Article V hereof.

"Capital Contribution" shall mean any cash or property contributed to the capital of the Company by or on behalf of a Member in exchange for Units, whenever made.

"Certificate of Formation" shall mean the Certificate of Formation of the Company, filed on June 27, 2008, and any and all amendments thereto, filed on behalf of the Company with the Secretary of State of the State of Delaware as required under the Delaware LLC Act.

"Class A Common Units" shall mean the Class A Common Voting Units of the Company.

"Class A Members" means holders of Class A Common Units.

"Class B Common Units" shall mean the Class B Common Non-Voting Units of the Company.

"Class C Common Units" shall mean the Class C Common Non-Voting Units of the Company.

"Class D Preferred Units" shall mean the Class D Preferred Voting Units of the Company.

"Class D Members" means holders of Class D Preferred Units.

"Class D Investor" shall mean Brooks Automation, Inc. and any of its Affiliates.

"Current Member" shall mean each Member of the Prior Agreement listed on Schedule A.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute.

"Delaware LLC Act" shall mean the Delaware Limited Liability Company Act, Delaware Code Title 6, Section 18-101, et seq., as amended.

"Equity Securities" means the equity securities of the Company including the Units, or any warrants, options, or other rights to acquire equity securities of the Company and debt securities convertible into equity securities of the Company.

"GAAP" means generally accepted accounting principles in the United States,

2

consistently applied.

"Initial Issuance of Class D Preferred Units" means the date Class D Preferred Units are first issued and sold by the Company.

"Initial Public Offering" means the initial public offering of Units, or other securities issued in respect or exchange of Units by way of a dividend, split, combination of Units, recapitalization, merger, consolidation, reorganization or a conversion of the Company from a limited liability company into a corporation, pursuant to a registration under the Securities Act of 1933, except if registered on a registration statement on Form S-8 or a successor form thereto.

"LLC Assets" shall mean all the assets and property, whether tangible or intangible, at any time owned by or held for the benefit of the Company.

"Lien" means any mortgage, pledge, lien security interest or other charge or encumbrance of any kind, including the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"Losses" shall mean any and all losses, claims, demands, costs, damages, liabilities (joint or several), expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which an Indemnitee (as defined in Section 7.17(a)) may be involved, or threatened to be involved, as a party or otherwise.

"Member" shall mean any Person executing this Agreement as of the date of this Agreement as a member of the Company, any other Person who was a member of the Company pursuant to the Prior Agreement, or any Person hereafter admitted to the Company as a Member as provided in this Agreement (each in the capacity as a Member of the Company), but does not include any Person who has ceased to be a Member of the Company pursuant to the terms of this Agreement.

"Percentage Interest" shall mean a Member's allocable interest in items of income, gain, loss, deduction and credit of or to the Company. A Member's Percentage Interest is equal to a fraction, expressed as a percentage (a) the numerator of which is the number of Units held by such Member, and (b) the denominator of which is the aggregate number of Units held by all Members, and may be amended from time to time pursuant to Section 5.1. The Members' Percentage Interests as of the date hereof are set forth on Schedule B.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust, unincorporated organization or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Subsidiary" means any corporation, partnership, joint venture, limited liability company or trust of which (or in which) more than 50% of (a) the voting power or equity rights, (b) the interest in the capital or profits of such limited liability company, partnership or joint venture or (c) the beneficial interest in such trust is at the time, directly or indirectly, owned by

Case: 17-31272    Doc# 124    Filed: 03/21/18    Entered: 03/21/18 12:10:21    Page 10 of 81

the Company, by the Company and one or more of its other Subsidiaries, or by one or more of the Company's Subsidiaries.

"Super Majority Class D Vote" means the written consent or affirmative vote of the holders of at least 70% of the then outstanding Class D Preferred Units, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class.

"Supply Agreement" means a Joint Development and Supply Agreement, as it may be amended or supplemented, that is contemplated by the non-binding memorandum of understanding dated on or about the date hereof the between the Company and Brooks Automation, Inc.

"Transfer" shall mean, as to any Unit, to sell, or in any other way directly or indirectly transfer, assign, distribute, pledge, hypothecate, encumber or otherwise dispose of, either voluntarily or involuntarily; the terms Transferring and Transferred shall have meanings correlative to the foregoing.

"Units" shall mean collectively the Class A Common Units, Class B Common Units, Class C Common Units, and Class D Preferred Units representing membership units of the Company.

"Voting Units" means the Class A Common Units and the Class D Preferred Units.

1.2.    Accounting Principles.  Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, such determination or computation shall be done in accordance with GAAP at the time in effect, to the extent applicable, except where such principles are inconsistent with the requirements of this Agreement.

ARTICLE II

ORGANIZATION

2.1.    Certificate of Formation.  Prior to the date hereof, the Certificate of Formation was filed with the Secretary of State of the State of Delaware.  Each of the Members of the Company hereby:

(a)    approves and ratifies the filing of the original Certificate of Formation with the Secretary of State of the State of Delaware on June 27, 2008;

(b)    confirms and agrees to its status as a Member of the Company;

(c)    becomes party to this Agreement for the purpose of establishing the rights, duties and relationship of the Members;

4

(d)　(i) agrees that if the laws of any jurisdiction in which the Company transacts business so require, any of the Members or authorized representatives of the Company shall file on behalf of the Company, or shall cause to be filed on behalf of the Company, with the appropriate office in that jurisdiction, any documents necessary for the Company to qualify to transact business under such laws; and (ii) agrees and obligates itself to execute, acknowledge, and cause to be filed for record in the place or places and manner prescribed by law, any amendments to the Certificate of Formation as may be required, either by the Delaware LLC Act, by the laws of any jurisdiction in which the Company transacts business, or by this Agreement, to reflect changes in the information contained therein or otherwise to comply with the requirements of law for the continuation, preservation and operation of the Company as a limited liability company under the Delaware LLC Act; and

(e)　represents and warrants that:

(i)　it has full power and authority to execute, deliver and perform its obligations under this Agreement;

(ii)　this Agreement has been duly and validly authorized, executed and delivered by it, and constitutes a valid and binding obligation of it, enforceable against it in accordance with its terms except to the extent that enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally;

(iii)　the execution, delivery and performance of this Agreement by it does not (A) violate, conflict with, or constitute a breach of or default under its organizational documents, if any, or any material agreement to which it is a party or by which it is bound or (B) violate any law, regulation, order, writ, judgment, injunction or decree applicable to it; and

(iv)　no consent or approval of, or filing with, any governmental or regulatory body is required to be obtained or made by it in connection with the transactions contemplated hereby or, if required, has not been obtained or made.

2.2.　<u>Name of the Company</u>.  The name under which the Company shall conduct its business is "BioCision, LLC".  The business of the Company may be conducted under any other name permitted by the Delaware LLC Act that is deemed necessary or desirable by the Board in its sole and absolute discretion.  The Board or authorized representatives of the Company promptly shall execute, file and record, or cause to be executed, filed and recorded, any assumed or fictitious name certificates required by the laws of the State of Delaware or any state in which the Company conducts business.

2.3.　<u>Place of Business</u>.  The location of the principal place of business of the Company shall be 775 E. Blithedale Ave., Suite 203, Mill Valley, California 94941.  The Board may hereafter change the principal place of business of the Company to such other place or places as the Board may from time to time determine in its sole and absolute discretion.  If necessary, the Board shall amend, or shall cause to be amended, the Certificate of Formation in accordance with the applicable requirements of the Delaware LLC Act.  The Board may, in its sole and absolute discretion, establish and maintain such other offices and additional places of business of the Company, either within or without the State of Delaware, as it deems appropriate.

5

2.4.     Registered Office and Registered Agent.  The registered office of the Company in the State of Delaware is 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle.  The registered agent for service of process of the Company at such address is Corporate Services Company.  The registered office and the registered agent of the Company may be changed by the Board from time to time in accordance with the then applicable provisions of the Delaware LLC Act and any other applicable laws.

2.5.     Lack of Authority of Members.  No Member shall have the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures, debts, liabilities or obligations on behalf of the Company, unless the Member is so authorized by the Board.

2.6.     Ownership of Property.  The Units of each Member shall be personal property for all purposes.  All LLC Assets and interests in LLC Assets shall be deemed owned by the Company as an entity, and no Member individually shall have any ownership of such LLC Assets or interest in such LLC Assets except as a Member in the Company and as set forth in this Agreement or under the Delaware LLC Act.

2.7.     Current Members.  Each of the Current Members is confirmed as a Member effective as of the date of this Agreement.

2.8.     No State Law Partnership.  The Members intend that the Company shall not be a partnership (including, without limitation, a general partnership or a limited partnership) or a joint venture, and that no Member or Manager shall be a partner or joint venture of any other Member or Manager with respect to the business of the Company, for any purposes other than U.S. federal, state and local income tax purposes, and this Agreement shall not be construed to suggest otherwise.  The Members intend that the Company shall be a partnership for U.S. federal, state and local tax purposes.

ARTICLE III

PURPOSES AND POWERS OF THE COMPANY

3.1.     Purpose.  The purposes of the Company shall be:

(a)     to operate and manage the business of the Company and to take any action as the Board determines necessary or appropriate in connection therewith;

(b)     to enter into any lawful transaction and engage in any lawful activities in furtherance of the foregoing purposes and as may be necessary, incidental or convenient to carry out the business of the Company as contemplated by this Agreement; and

(c)     to engage in any lawful business permitted by the Delaware LLC Act or the laws of any other jurisdiction in which the Company may do business.

3.2.     Powers.  Subject to all of the provisions of this Agreement, the Company shall have the power to do any and all acts and things necessary, appropriate, advisable or convenient for the furtherance and accomplishment of the purposes of the Company, including, without

6

limitation, to engage in any kind of activity and to enter into and perform obligations of any kind necessary to or in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as said activities and obligations may be lawfully engaged in or performed by a limited liability company under the Delaware LLC Act.

ARTICLE IV

TERM OF THE COMPANY

4.1.    Term.  The term of the Company commenced on the date upon which the Certificate of Formation was duly filed with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved.

ARTICLE V

UNITS; CAPITAL ACCOUNTS AND ALLOCATIONS

5.1.    Authorized Equity; Units and Percentage Interests of Members.  The authorized equity of the Company is 10,000,000 Units, 5,069,912 of which shall be Designated Class A Common Voting Units, 2,321,000 of which shall be designated Class B Common Non-Voting Units, 646,806 of which shall be designated Class C Common Non-Voting Units, and 1,962,282 of which shall be designated Class D Preferred Voting Units.  The Class B Common Units are reserved for issuance to employees and consultants of the Company pursuant to one or more Company equity incentive plans.  A Member's membership interest in the Company shall be represented by the Units held by such Member.  The ownership of Units and the Percentage Interests of the Members upon the date of this Agreement are as set forth in Schedule B hereto. Subject to the terms of this Agreement, Schedule B hereto shall be amended from time to time by the Board to the extent necessary to reflect accurately the ownership of Units and the relative Percentage Interests of the Members, as the same may be affected from time to time by additional Unit purchases, the admission of additional Members, the withdrawal of Members, the Transfer of Units, distributions or similar events.  Except as otherwise provided in the Delaware LLC Act, the Members shall not be required to make any Capital Contributions to the Company.

5.2.    Issuance of Additional Units.  Subject to Articles V and VII, the Board is hereby authorized to cause the Company from time to time to issue to Members or other Persons (who upon such issuance and the execution by such Persons of such documents as the Board deems necessary or appropriate to evidence such Persons' agreement to be admitted as a Member and to be bound by the terms and conditions of the governance documents of the Company and this Agreement, shall automatically become Members) additional or initial Units for such consideration and in one or more classes, or one or more series of any such classes, with such designations, preferences and relative, participating, optional or other special rights, powers and duties, including rights, powers and duties senior to the then-existing Units, all as shall be determined by the Board in its sole and absolute discretion, subject to the requirements of the Delaware LLC Act, the Code and other applicable laws, including, without limitation (i) the allocations of items of Company income, gain, loss, deduction and credit to each such class or series of Units; (ii) the right of each such class or series of Units to share in Company

7

distributions; and (iii) the rights of each such class or series of Units upon dissolution and liquidation of the Company.

5.3.   Capital Accounts.   A separate Capital Account shall be established and maintained for each Member.

5.4.   Allocations.

(a)   The balances of the Capital Account for each Member shall be maintained in the financial accounting records of the Company. The Capital Account of each Member shall be increased by:

(i)   the U.S. Dollar amount of any additional cash amounts contributed by such Member;

(ii)   the fair market value of any additional contributions of property (other than cash) to the Company by such Member; and

(iii)   allocations to such Member with respect to profit and gain.

(b)   The Capital Account of each Member shall be decreased by:

(i)   the U.S. Dollar amount of any cash distributions made to such Member;

(ii)   the fair market value of any property (other than cash) distributed to such Member; and

(iii)   allocations to such Member with respect to deductions or loss.

(c)   Until the Initial Issuance of Class D Preferred Units, for Capital Account purposes, (A) all items of loss and deduction shall be allocated (i) first, pro rata, to the holders of Class C Common Units according to the positive balances in their respective Capital Accounts until such Capital Accounts are reduced to zero, (ii) second, pro rata, to the holders of Class A Common Units and Class B Common Units according to the positive balances in their respective Capital Accounts until such Capital Accounts are reduced to zero, and (iii) third, pro rata, to the Members in accordance with their Percentage Interests, and (B) all items of profit and gain shall, for Capital Account purposes, be allocated (i) first, pro rata, to the holders of Class C Common Units in order to reverse any allocations of loss or deduction made pursuant to the preceding clauses, (ii) second, pro rata, to the to the holders of Class A Common Units and Class B Common Units in order to reverse any allocations of loss or deduction made pursuant to the preceding clauses and (iii) third, pro rata, to the Members in accordance with their Percentage Interests. On and after the Initial Issuance of Class D Preferred Units, for Capital Account purposes, (X) all items of loss and deduction shall be allocated (i) first, pro rata, to the holders of Class D Preferred Units according to the positive balances in their respective Capital Accounts until such Capital Accounts are reduced to zero, (ii) second, pro rata, to the holders of Class C Common Units according to the positive balances in their respective Capital Accounts until such Capital Accounts are reduced to zero (iii) third, pro rata, to the holders of Class A Common

8

Units and Class B Common Units according to the positive balances in their respective Capital Accounts until such Capital Accounts are reduced to zero, and (iv) fourth, pro rata, to the Members in accordance with their Percentage Interests, and (Y) all items of profit and gain shall, for Capital Account purposes, be allocated (i) first, pro rata, to the holders of Class D Preferred Units in order to reverse any allocations of loss or deduction made pursuant to the preceding clauses, (ii) second, pro rata, to the holders of Class C Common Units in order to reverse any allocations of loss or deduction made pursuant to the preceding clauses, (iii) third, pro rata, to the to the holders of Class A Common Units and Class B Common Units in order to reverse any allocations of loss or deduction made pursuant to the preceding clauses and (iv) fourth, pro rata, to the Members in accordance with their Percentage Interests.

(i)     The Capital Accounts of the Class D Members upon the date of this Agreement are as set forth in Schedule C hereto.  Subject to the terms of this Agreement, Schedule C hereto shall be amended from time to time by the Board to the extent necessary to reflect accurately the Capital Accounts of the Class D Members.

(d)     Notwithstanding anything else in this Section 5.4 to the contrary, items of Company income, gain, loss or deduction for any fiscal period ("Liquidity Event Period") for which distributions to Members will be made in accordance with Section 6.2 shall be made in same manner to cause each Member's Capital Account to equal, as nearly as possible, the amount they are entitled to receive under Section 6.2.  The Board may apply this Section 5.4(d) to fiscal periods preceding a Liquidity Event Period and may allocate separate items of income, gain, loss, or deduction for any period, if it reasonably believes it will not have sufficient items of income, gain, loss or deduction for the Liquidity Event Period to achieve the objective of the preceding sentence.

(e)     For federal, state and local income tax purposes, items of income, gain, loss, deduction and credit shall be allocated to the Members in accordance with the allocations of the corresponding items for Capital Account purposes under this Section 5.4, except that items with respect to which there is a difference between tax and book basis will be allocated in accordance with section 704(c) of the Code, the Treasury Regulations thereunder, and Treasury Regulations Sections 1.704-1(b)(4)(i) and 1.704-3(b)(1).

(f)     In the event the Company incurs any nonrecourse liabilities, income and gain shall be allocated in accordance with the "minimum gain chargeback" provisions of Sections 1.704-1(b)(4)(iv) and 1.704-2 of the Treasury Regulations.

(g)     Subject to the provisions of Section 5.4(f), but notwithstanding any other provision set forth in this Section 5.4, no item of deduction or loss shall be allocated to a Member to the extent such allocation would cause a negative balance in such Member's Capital Account (after taking into account the adjustments, allocations and distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6)).  In the event some but not all of the Members would have such excess Capital Account deficits as a consequence of such allocation, the limitation set forth in this Section 5.4(g) shall be applied on a Member-by-Member basis so as to allocate the maximum permissible deduction or loss to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).  In the event any loss or deduction shall be specially allocated to a Member pursuant to the preceding sentence, an equal amount of

9

income or gain of the Company shall be specially allocated to such Member prior to any allocation pursuant to Section 5.4(c).

(h)     Subject to the provisions of this Section 5.4, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of the Company's income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate as quickly as possible any deficit balance in such Member's Capital Account in excess of that permitted under Section 5.4(g) created by such adjustments, allocations or distributions.  Any special allocations of items of income or gain pursuant to this Section 5.4(h) shall be taken into account in computing subsequent allocations pursuant to this Article V so that the net amount of any items so allocated and all other items allocated to each Member pursuant to this Article V shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article V if such unexpected adjustments, allocations or distributions had not occurred.

(i)      The Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(e) in the case of a distribution of any property (other than cash).

(j)      The provisions of this Section 5.4 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(k)     A transferee of all (or a portion) of the Units of a Member shall succeed to the Capital Account (or portion of the Capital Account) attributable to the transferred Units on a pro rata basis.

5.5.     Dividends.

(a)     From and after the date of the issuance of any Class D Preferred Units, dividends at the rate per annum of eight percent (8%) of the applicable Class D Original Issue Price (as defined in Article VI) of each such Unit shall accrue on such Class D Preferred Units (the "Accruing Dividends").  Accruing Dividends shall accrue from day to day, whether or not declared, and shall be cumulative but not compounding; provided, however, that except as set forth in the following sentence of this Section 5.5 or in Section 6.2(a) and Section 6.2(e), such Accruing Dividends shall be payable only when, as, and if declared by the Board and the Company shall be under no obligation to pay such Accruing Dividends.  The Company shall not declare, pay or set aside any dividends on Equity Securities of any other class or series of Equity Securities of the Company (other than dividends on Class A Common Units payable in units of Class A Common Units) unless (in addition to the obtaining of any consents required elsewhere in this Agreement) the holders of the Class D Preferred Units then outstanding shall first receive, or simultaneously receive, a dividend on each outstanding Class D Preferred Unit in an amount at least equal to the sum of (i) the amount of the aggregate Accruing Dividends then accrued on such Class D Preferred Unit and not previously paid and (ii) (A) in the case of a dividend on Class A Common Units or any class or series that is convertible into Class A Common Units,

10

that dividend per Class D Preferred Unit as would equal the product of (1) the dividend payable on each unit of such class or series determined, if applicable, as if all units of such class or series had been converted into Class A Common Units and (2) the number of Class A Common Units issuable upon conversion of a Class D Preferred Unit, in each case calculated on the record date for determination of holders entitled to receive such dividend or (B) in the case of a dividend on any class or series that is not convertible into Class A Common Units, at a rate per Class D Preferred Unit determined by (1) dividing the amount of the dividend payable on each unit of such class or series of units by the original issuance price of such class or series of units (subject to appropriate adjustment in the event of any dividend, unit split, combination or other similar recapitalization with respect to such class or series) and (2) multiplying such fraction by an amount equal to the Class D Original Issue Price (as defined in <u>Article VI</u>); <u>provided</u> that if the Company declares, pays or sets aside, on the same date, a dividend on units of more than one class or series of units of the Company, the dividend payable to the holders of Class D Preferred Units pursuant to this <u>Section 5</u> shall be calculated based upon the dividend on the class or series of units that would result in the highest Class D Preferred Units dividend.

(b)     Subject to the foregoing paragraph (in addition to the obtaining of any consents required elsewhere in this Agreement), each Class A Common Unit, Class B Common Unit and Class C Common Unit shall rank on a parity with each other Class A Common Unit, Class B Common Unit and Class C Common Unit, irrespective of series, with respect to dividends and no dividends shall be declared or paid or set apart for payment on the Class A Common Units, Class B Common Units and Class C Common Units unless at the same time an equal dividend shall also be declared or paid or set apart for payment, as the case may be, on the Class A Common Units, Class B Common Units and Class C Common Units then outstanding.

5.6.     <u>Advances to the Company</u>.  Members may, with the prior written consent of the Board, advance funds to the Company in excess of the amounts required hereunder or pursuant to any subscription agreement to be contributed by them to the capital of the Company with the consent of the Board.  Any such approved advances by a Member shall not result in any increase in the amount of such Member's Capital Account or entitle it to any additional Units.  The amounts of such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the LLC Assets in accordance with terms and conditions agreed upon by the Board.

5.7.     <u>Liability of Members, Directors and the Manager</u>.  Except as otherwise provided in the Delaware LLC Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, Directors or the Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Director or the Manager.  The failure of the Company to observe any formalities or requirements relating to the exercise of its power or management of its business or affairs under the Delaware LLC Act or this Agreement shall not be grounds for imposing personal liability on any Member, Director or Manager for debts, obligations, or liabilities of the Company.

5.8.     <u>Return of Capital</u>.  Except upon the dissolution of the Company and as may be specifically provided in <u>Section 10.3</u>, no Member shall have the right to withdraw from the

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 18 of 81

Company or to demand or to receive the return of all or any part of its Capital Account or his or its Capital Contributions to the Company.

5.9.   Distributions.  The net profits of the Company shall be calculated from time to time as determined by the Board.  All distributions shall be made out of net profits in such amounts and at such times as determined by the Board.  Subject to Section 5.5, Section 5.12 and Section 6.2, all distributions out of net profits with respect to any calendar year shall be made to the Members, pro rata, in proportion to the items of profit and gain allocated to each (after reversal of items of loss and deduction) with respect to such calendar year.  The date on which the resolution of the Board declaring a distribution is adopted shall be the record date for determination of the Members entitled to receive such distribution.

5.10.   Income Tax Distributions.  In order to assist Members in paying income taxes on income allocated to them, the Board shall, no later than 10 days after the end of the calendar year, cause the Company to distribute, to the extent funds are available therefor, and it is otherwise practicable (in the Board's judgment), to each Person with a Members' Income Tax Distribution Amount for the prior calendar year, cash in an amount equal to the excess, if any, of (i) the Board's estimate of such Person's Member Income Tax Distribution Amount for such calendar year, over (ii) the aggregate amount of distributions to such Member during such calendar year (other than a distribution pursuant to this Section 5.10 made with respect to a prior year).  "Members' Income Tax Distribution Amount" for any calendar year means, with respect to each Person who is a Member or to whom an item of income or gain was allocated during such calendar year (after reversal of items of loss and deduction), the product of (A) such Person's share of taxable income of the Company for such calendar year (as determined by the Board) and (B) 80% of the highest marginal rate of federal individual income tax for such calendar year, as determined by the Board.  The Board may make advance distributions to Members on account of distributions required under this Section 5.10 at more frequent intervals than annually, but shall not be required to do so.

5.11.   Withholding and Payments on Behalf of a Member.  The Company is hereby authorized to withhold from distributions, or to make payments on behalf of a Member in his or its capacity as such, all amounts that the Company is required by law to withhold or pay on behalf of such Member (including for the purposes of federal, state and local income tax withholding, state personal property taxes and state unincorporated business taxes).  All amounts withheld by the Company from distributions or paid by the Company on behalf of a Member pursuant to the foregoing sentence shall be deemed to have been distributed to the Member otherwise entitled to receive the amount so withheld or on whose behalf the amount was paid.

5.12.   Limitation Upon Distributions.  No distribution to Members shall be declared and paid unless, after the distribution is made, the fair market value of the LLC Assets is in excess of all liabilities of the Company (other than liabilities to Members in their capacities as creditors of the Company).

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 19 of 81

## ARTICLE VI

## LIQUIDATION AND CONVERSION RIGHTS OF CLASS D PREFERRED UNITS AND CLASS C COMMON UNITS

6.1.    <u>Definitions</u>.  For purposes of this <u>Article VI</u>, the following definitions shall apply:

(a)    "<u>Class C Conversion Price</u>" shall mean $3.20 per unit for the Class C Common Units (subject to adjustment from time to time as set forth elsewhere herein).

(b)    "<u>Class C Liquidation Preference</u>" shall mean $3.20 per Class C Common Unit for the Class C Common Units (subject to adjustment from time to time for Recapitalizations of the Class C Common Units as set forth elsewhere herein).

(c)    "<u>Class C Original Issue Price</u>" shall mean $3.20 per unit for the Class C Common Units (subject to adjustment from time to time for Recapitalizations of the Class C Common Units as set forth elsewhere herein).

(d)    "<u>Class D Conversion Price</u>" shall mean $2.98 per unit for the Class D Preferred Units (subject to adjustment from time to time as set forth elsewhere herein).

(e)    "<u>Class D Liquidation Preference</u>" shall mean an amount per Class D Preferred Unit equal to the greater of (i) one (1) times the Class D Original Issue Price, plus any Accruing Dividends accrued but unpaid thereon, whether or not declared, together with any other dividends declared but unpaid thereon, or (ii)  such amount per Class D Preferred Unit as would have been payable had all Class D Preferred Units been converted into Class A Common Units pursuant to <u>Section 6.4</u> immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event.

(f)    "<u>Class D Original Issue Price</u>" shall mean $2.98 per unit for the Class D Common Units (subject to adjustment from time to time for Recapitalizations of the Class D Preferred Units as set forth elsewhere herein).

(g)    "<u>Convertible Securities</u>" shall mean any evidences of indebtedness, units or other securities convertible into or exchangeable for Class A Common Units or Class B Common Units.

(h)    "<u>Deemed Liquidation Event</u>" shall mean each of the following events unless the holders of at least majority of the outstanding Class D Preferred Units elect otherwise (<u>provided</u>, <u>however</u>, that if the Class D Investor is a constituent party to any of the following events, then the Super Majority Class D Vote shall be required to elect otherwise) by written notice sent to the Company at least 10 days prior to the effective date of any such event:

(i)    a merger or consolidation in which

(a)    the Company is a constituent party or

13

(b)     a subsidiary of the Company is a constituent party and the Company issues units pursuant to such merger or consolidation,

except any such merger or consolidation involving the Company or a subsidiary in which the units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for units that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the units of (1) the surviving or resulting company; or (2) if the surviving or resulting company is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent company of such surviving or resulting company; or

(ii)     the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole, or the sale or disposition (whether by merger, consolidation or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

(i)     "Distribution" shall mean the transfer of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Class A Common Units payable in Class A Common Units, or the purchase or redemption of units of the Company for cash or property other than: (i) repurchases of Class A Common Units or Class B Common Units issued to or held by employees, officers, directors or consultants of the Company or its subsidiaries at no greater than cost upon termination of their employment or services pursuant to agreements or under existing equity incentive plans existing on the Class D Original Issue Date providing for the right of said repurchase, or (ii) repurchases of Class A Common Units or Class B Common Units issued to or held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such right.

(j)     "Options" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Class A Common Units, Class B Common Units or Convertible Securities.

(k)     "Recapitalization" shall mean any dividend of units, split of units, combination of units, reorganization, recapitalization, reclassification or other similar event.

6.2.     Liquidation Rights.

(a)     Preferential Payments to Holders of Class D Preferred Units.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, the holders of Class D Preferred Units then outstanding shall first be entitled to be paid out of LLC Assets available for distribution to its Members before any payment shall be made to the holders of other Units by reason of their ownership thereof, an amount per unit equal to the Class D Liquidation Preference (the amount payable pursuant to this sentence is hereinafter referred to as the "Class D Liquidation Amount").  If upon any such liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, the LLC

14

Assets available for distribution to its Members shall be insufficient to pay the holders of Class D Preferred Units the full amount to which they shall be entitled under this Section 6.2(a), the holders of Class D Preferred Units shall share ratably in any distribution of the LLC Assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the units held by them upon such distribution if all amounts payable on or with respect to such units were paid in full.

(b)     Preferential Payments to Holders of Class C Common Units.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, after and subject to the payment in full of all amounts required to be distributed to holders of Class D Preferred Units pursuant to Section 6.2(a), the holders of Class C Common Units then outstanding shall be entitled to be paid out of the LLC Assets available for distribution to its Members before any payment shall be made to the holders of Class A Common Units or Class B Common Units by reason of their ownership thereof, an amount per unit equal to the Class C Liquidation Preference (the amount payable pursuant to this sentence is hereinafter referred to as the "Class C Liquidation Amount").  If upon any such liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, after and subject to the payment in full of all amounts required to be distributed to holders of Class D Preferred Units pursuant to Section 6.2(a), the LLC Assets available for distribution to its Members shall be insufficient to pay the holders of Class C Common Units the full amount to which they shall be entitled under this Section 6.2(b), the holders of Class C Common Units shall share ratably in any distribution of the LLC Assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the Class C Common Units held by them upon such distribution if all amounts payable on or with respect to such units were paid in full.

(c)     Payments to Holders of Class A Common Units and Class B Common Units.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of Class D Preferred Units and Class C Common Units pursuant to Section 6.1(a) and 6.2(b), the remaining LLC Assets available for distribution to its Members shall be distributed among the holders of Class A Common Units and Class B Common Units, pro rata based on the number of Units held by each such holder.

(d)     Units not Treated as Multiple Classes in any Distribution.  A holder of Class C Common Units or Class D Preferred Units shall not be entitled to convert such Class C Common Units or Class D Preferred Units into Class A Common Units in order to participate in any Distribution, or series of Distributions, payable to holders of Class A Common Units, without first foregoing participation in the Distribution, or series of Distributions, as a holder of Class C Common Units or Class D Preferred Units with respect to the Units so converted.

(e)     Effecting a Deemed Liquidation Event.

(i)     The Company shall not have the power to effect a Deemed Liquidation Event referred to in this Article VI unless the agreement or plan of merger or consolidation for such transaction (the "Merger Agreement") provides that the consideration

15

payable to the Members of the Company shall be allocated among the Members of the Company in accordance with Sections 6.2(a), 6.2(b), and 6.2(c).

(ii)     In the event of a Deemed Liquidation Event referred to in Sections 6.1(h)(i)(b) or 6.1(h)(ii), if the Company does not effect a dissolution of the Company under the Delaware LLC Act within ninety (90) days after such Deemed Liquidation Event, then (i) the Company shall send a written notice to each holder of Class C Common Units and Class D Preferred Units no later than the ninetieth (90th) day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to require the redemption of such Class C Common Units and Class D Preferred Units, and (iii) if the holders of at least majority of the then outstanding Class D Preferred Units so request in a written instrument delivered to the Company not later than one hundred twenty (120) days after such Deemed Liquidation Event, the Company shall use the consideration received by the Company for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board), together with any other LLC Assets available for distribution to its Members, all to the extent permitted by the Delaware LLC Act governing distributions to Members (the "Available Proceeds"), on the one hundred fiftieth (150th) day after such Deemed Liquidation Event (the "Redemption Date"), to redeem (i) first all outstanding Class D Preferred Units at a price per unit equal to the Class D Liquidation Amount (the "Class D Redemption Price") and (ii) then all outstanding Class C Common Units at a price per unit equal to the Class C Liquidation Amount (the "Class C Redemption Price" and together with the Class D Redemption Price, the "Redemption Price").  Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, if the Available Proceeds are not sufficient to redeem all outstanding Class C Common Units and Class D Preferred Units, the Company shall first ratably redeem each holder's Class D Preferred Units and then ratably redeem each holder's Class C Common Units to the fullest extent of such Available Proceeds. The Company shall then redeem the remaining units as soon as it may lawfully do so under the Delaware LLC Act governing distributions to Members.   Prior to the distribution or redemption provided for in this Section 6.2(e)(ii), the Company shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event.

(iii)     If the Company is redeeming Class C Common Units and Class D Preferred Units pursuant to Section 6.2(e)(ii), the Company shall send written notice of the redemption (the "Redemption Notice") to each holder of record of Class C Common Units and Class D Preferred Units not less than forty (40) days prior to each Redemption Date.  Each Redemption Notice shall state:

(a)     the number of Class C Common Units and Class D Preferred Units held by the holder that the Company shall redeem on the Redemption Date specified in the Redemption Notice;

(b)     the Redemption Date and the Redemption Price; and

(c)     for holders of units in certificated form, that the holder is to surrender to the Company, in the manner and at the place designated, his, her or its certificate or certificates representing the Class C Common Units and Class D Preferred Units to be redeemed.

(iv)     On or before the applicable Redemption Date, each holder of Class C Common Units or Class D Preferred Units to be redeemed on such Redemption Date, shall, surrender the certificate or certificates representing such units (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such certificate) to the Company, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such units shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof. In the event less than all of the Class C Common Units and Class D Preferred Units represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed Class C Common Units or Class D Preferred Units shall promptly be issued to such holder.

(f)     Amount Deemed Paid or Distributed. If the amount deemed paid or distributed under this Section 6.2(f) is made in property other than in cash, the value of such distribution shall be the fair market value of such property, determined as follows:

(i)     For securities not subject to investment letters or other similar restrictions on free marketability,

(a)     if traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange or market over the thirty (30) day period ending three (3) days prior to the closing of such transaction;

(b)     if actively traded over-the-counter, the value shall be deemed to be the average of the closing bid prices over the thirty (30) day period ending three (3) days prior to the closing of such transaction; or

(c)     if there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Board.

The value of such property, rights or securities shall be determined in good faith by the Board. The Board's determination may be contested if the holders of at least ten percent (10%) of the outstanding Class D Preferred Units (the "Contesting Holders"), notify the Board within five (5) business days after receiving such determination that they disagree with such determination. Upon such notification, the Board and the Contesting Holders shall have 30 days to agree upon a valuation. If, by the end of such 30-day period they are unable to agree on a valuation, a final, binding and definitive valuation shall be determined by an appraisal to be paid for the by the Company. All appraisals shall be undertaken by two appraisers, one selected by the Company and one selected by the Contesting Holders, which selections must be made within 10 days after the expiration of the 30-day period described above. If one selecting party fails to timely select its appraiser, the other selecting party shall select both appraisers. The valuation

Case: 17-31272     Doc# 124     Filed: 03/21/18     Entered: 03/21/18 12:10:21     Page 24 of 81

shall be arrived at by those appraisers within 60 days following the appointment of the last appraiser to be appointed. In the event that the two appraisers cannot agree on a valuation within such a period of time, (i) if the appraisers' valuations are within 10% of each other the definitive valuation shall be the average of the two valuations and (ii) if the differences in the valuations are greater, the appraisers shall elect a third appraiser who will calculate a valuation independently, and, except as provided in the next sentence, the definitive valuation shall in each case be the average of the two valuations arrived at by the appraisers who are closest in amount. In the event that the two original appraisers cannot agree upon a third appraiser within 30 days following the end of the 60-day period referred to above, then the third appraiser shall be appointed by the American Arbitration Association.

6.3.    <u>Class C Conversion</u>. The holders of the Class C Common Units shall have conversion rights as follows:

(a)    <u>Class C Right to Convert</u>. Each Class C Common Unit shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such unit at the office of the Company or any transfer agent for the Class C Common Units, into that number of fully-paid, nonassessable Class A Common Units determined by dividing the Class C Original Issue Price of the by the Class C Conversion Price. (The number of Class A Common Units into which each Class C Common Unit may be converted is hereinafter referred to as the "<u>Class C Conversion Rate</u>".) Upon any decrease or increase in the Class C Conversion Price, as described in this <u>Section 6.3</u>, the Class C Conversion Rate shall be appropriately increased or decreased.

(b)    <u>Class C Automatic Conversion</u>. Each unit of the Class C Common Units shall automatically be converted into units of the Class A Common Units at the then effective Class C Conversion Rate (i) immediately prior to the closing of a firm commitment underwritten initial public offering pursuant to an effective registration statement filed under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), covering the offer and sale of the Company's Class A Common Units, <u>provided</u> that the offering price per unit is not less than $6.00 (as adjusted for Recapitalizations) and the aggregate gross proceeds to the Company are not less than Thirty-Five Million dollars ($35,000,000), or (ii) upon the receipt by the Company of a written request for such conversion from the holders of at least fifty percent (50%) of the Class C Common Units then outstanding, or, if later, the effective date for conversion specified in such request (each of the events referred to in (i) and (ii) are referred to herein as an "<u>Class C Automatic Conversion Event</u>").

(c)    <u>Class C Mechanics of Conversion</u>. No fractional Class A Common Units shall be issued upon conversion of Class C Common Units. In lieu of any fractional units to which the holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by the then fair market value of a unit of the Class A Common Units as determined by the Board. For such purpose, all units of the Class C Common Units held by each holder of Class C Common Units shall be aggregated, and any resulting fractional Class A Common Unit shall be paid in cash. Before any holder of Class C Common Units shall be entitled to convert the same into full Class A Common Units, and to receive certificates therefor, he shall deliver a written election to convert his Class C Common Units and surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or of any transfer agent for the Units, if

18

certificates representing the Class C Common Units to be converted had previously been issued to the; provided, however, that on the date of a Class C Automatic Conversion Event, the outstanding units of the Class C Common Units shall be converted automatically without any further action by the holders of such units and whether or not any certificates representing such units are surrendered to the Company or its transfer agent  On the date of the occurrence of a Class C Automatic Conversion Event, each holder of record of Class C Common Units shall be deemed to be the holder of record of the Class A Common Units issuable upon such conversion.

(d)     Adjustments for Subdivisions or Combinations of Class A Common Units. In the event the outstanding units of the Class A Common Units shall be subdivided (by unit split, by payment of a dividend in Class A Common Units or otherwise), into a greater number of Class A Common Units, the Class C Conversion Price in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased.  In the event the outstanding units of the Class A Common Units shall be combined (by reclassification or otherwise) into a lesser number of Class A Common Units, the Class C Conversion Price in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(e)     Adjustments for Subdivisions or Combinations of Class C Common Units. In the event the outstanding Class C Common Units shall be subdivided (by unit split, by payment of a dividend in Class C Common Units or otherwise), into a greater number of Class C Common Units, the Class C Original Issue Price in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased.  In the event the outstanding Class C Common Units shall be combined (by reclassification or otherwise) into a lesser number of Class C Common Units, the Class C Original Issue Price in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(f)     Adjustments for Reclassification, Exchange and Substitution.  Subject to Section 6.2, if the Class A Common Units issuable upon conversion of the Class C Common Units shall be changed into the same or a different number of Units of any other class or classes of securities, whether by capital reorganization, reclassification, reorganization of the Company as a corporation, or otherwise (other than a subdivision or combination of Units provided for above), then, in any such event, in lieu of the number of Units of the Class A Common Units which the holders would otherwise have been entitled to receive each holder of such Class C Common Units (as the same may have been changed in such capital reorganization, reclassification, reorganization of the Company as a corporation, or otherwise) shall have the right thereafter to convert such Class C Common Units (or securities issued in lieu of such Class C Common Units) into a number of securities of such other class or classes of securities which a holder of the number of Class A Common Units deliverable upon conversion of such Class C Common Units immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other securities.

(g)     Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Class C Conversion Price or Class C Original Issue Price pursuant to this Section 6.3, the Company at its expense shall promptly compute such adjustment or readjustment

19

in accordance with the terms hereof and furnish to each holder of Class C Common Units a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon the written request at any time of any holder of Class C Common Units, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Class C Conversion Price at the time in effect and (iii) the number of Class A Common Units and the amount, if any, of other property which at the time would be received upon the conversion of the Class C Common Units.

(h)     Reservation of Units Issuable Upon Conversion. The Company shall at all times reserve and keep available out of its authorized but unissued Class A Common Units solely for the purpose of effecting the conversion of the units of the Class C Common Units, such number of its Class A Common Units as shall from time to time be sufficient to effect the conversion of all then outstanding units of the Class C Common Units; and if at any time the number of authorized but unissued units of the Class A Common Units shall not be sufficient to effect the conversion of all then outstanding units of the Class C Common Units, the Company will take such limited liability company action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued Class A Common Units to such number of units as shall be sufficient for such purpose.

6.4.     Class D Optional Conversion. The holders of the Class D Preferred Units shall have conversion rights as follows (the "Class D Conversion Rights"):

(a)     Right to Convert.

(i)     Conversion Ratio.     Each Class D Preferred Unit shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable Class A Common Units as is determined by dividing the Class D Original Issue Price by the Class D Conversion Price in effect at the time of conversion.

(ii)     Termination of Conversion Rights.     In the event of a liquidation, dissolution or winding up of the Company or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Class D Preferred Units.

(b)     Fractional Units.     No fractional Class A Common Units shall be issued upon conversion of the Class D Preferred Units. In lieu of any fractional units to which the holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by the fair market value of a Class A Common Unit as determined in good faith by the Board. Whether or not fractional units would be issuable upon such conversion shall be determined on the basis of the total number of Class D Preferred Units the holder is at the time converting into Class A Common Units and the aggregate number of Class A Common Units issuable upon such conversion.

(c)     Mechanics of Conversion.

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 27 of 81

(i)  Notice of Conversion.  In order for a holder of Class D Preferred Units to voluntarily convert Class D Preferred Units into Class A Common Units, such holder shall (a) provide written notice to the Company's transfer agent at the office of the transfer agent for the Class D Preferred Units (or at the principal office of the Company if the Company serves as its own transfer agent) that such holder elects to convert all or any number of such holder's Class D Preferred Units and, if applicable, any event on which such conversion is contingent and (b), if such holder's units are certificated, surrender the certificate or certificates for such Class D Preferred Units (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such certificate), at the office of the transfer agent for the Class D Preferred Units (or at the principal office of the Company if the Company serves as its own transfer agent).  Such notice shall state such holder's name or the names of the nominees in which such holder wishes the Class A Common Units to be issued.  If required by the Company, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Company, duly executed by the registered holder or his, her or its attorney duly authorized in writing.  The close of business on the date of receipt by the transfer agent (or by the Company if the Company serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "Class D Conversion Time"), and the Class A Common Units issuable upon conversion of the specified units shall be deemed to be outstanding of record as of such date.  The Company shall, as soon as practicable after the Class D Conversion Time (i) issue and deliver to such holder of Class D Preferred Units, or to his, her or its nominees, a certificate or certificates for the number of full Class A Common Units issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the Class D Preferred Units represented by the surrendered certificate that were not converted into Class A Common Units, (ii) pay in cash such amount as provided in Section 6.4(b) in lieu of any fraction of a Class A Common Unit otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the Class D Preferred Units converted.

(ii)  Reservation of Units.  The Company shall at all times when the Class D Preferred Units shall be outstanding, reserve and keep available out of its authorized but unissued units, for the purpose of effecting the conversion of the Class D Preferred Units, such number of its duly authorized Class A Common Units as shall from time to time be sufficient to effect the conversion of all outstanding Class D Preferred Units; and if at any time the number of authorized but unissued Class A Common Units shall not be sufficient to effect the conversion of all then outstanding units of the Class D Preferred Units, the Company shall take such limited liability company action as may be necessary to increase its authorized but unissued Class A Common Units to such number of units as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite Member approval of any necessary amendment to this Agreement.  Before taking any action which would cause an adjustment reducing the Class D Conversion Price below the then value of the Class A Common Units issuable upon conversion of the Class D Preferred Units, the Company will take any limited liability company action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and non-assessable Class A Common Units at such adjusted Class D Conversion Price.

21

(iii)  Effect of Conversion.  All Class D Preferred Units which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such units shall immediately cease and terminate at the Class D Conversion Time, except only the right of the holders thereof to receive Class A Common Units in exchange therefor, to receive payment in lieu of any fraction of a unit otherwise issuable upon such conversion as provided in Section 6.4(b) and to receive payment of any dividends declared but unpaid thereon.  Any Class D Preferred Units so converted shall be retired and cancelled and may not be reissued as units of such series, and the Company may thereafter take such appropriate action (without the need for Member action) as may be necessary to reduce the authorized number of Class D Preferred Units accordingly.

(iv)  No Further Adjustment.  Upon any such conversion, no adjustment to the Class D Conversion Price shall be made for any declared but unpaid dividends on the Class D Preferred Units surrendered for conversion or on the Class A Common Units delivered upon conversion.

(v)  Taxes.  The Company shall pay any and all issue and other similar taxes that may be payable in respect of any issuance or delivery of Class A Common Units upon conversion of Class D Preferred Units pursuant to this Section 6.4.  The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of Class A Common Units in a name other than that in which the Class D Preferred Units so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

(d)  Adjustments to Class D Conversion Price for Diluting Issues.

(i)  Special Definitions. For purposes of this Section 6.4(d), the following definitions shall apply:

(a)  "Option" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Class A Common Units or Class B Common Units, or Convertible Securities.

(b)  "Class D Original Issue Date" shall mean the date on which the first Class D Preferred Unit was issued.

(c)  "Convertible Securities" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Class A Common Units or Class B Common Units, but excluding Options.

(d)  "Additional Common Units" shall mean all Class A Common Units or Class B Common Units issued (or, pursuant to Section 6.4(d)(iii) below, deemed to be issued) by the Company after the Class D Original Issue Date, other than (1) the following Class A Common Units or Class B Common Units and (2) Class A Common Units or Class B Common Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "Exempted Securities"); provided, however, that the

22

number of Class A Common Units issued or deemed issued pursuant to Subsections 6.4(d)(i)(d)(7) through 6.4(d)(i)(d)(11) shall not exceed five percent (5%) in the aggregate of outstanding Units on the Class D Original Issue Date, and if at any time in the number of such Units issued or deemed issued exceeds such five percent (5%) in the aggregate of outstanding Units, the amount of Units in excess of such five percent (5%) of outstanding Units shall not be Exempted Securities but shall be Additional Common Units:

(1)     Class A Common Units, Options or Convertible Securities issued as a dividend or distribution on Class D Preferred Units;

(2)     Class A Common Units, Options or Convertible Securities issued by reason of a dividend, unit split, split-up or other distribution on Units that is covered by Sections 6.4(e), 6.4(f), 6.4(g), or 6.4(h);

(3)     Class A Common Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement in existence as of the Class D Original Issuance Date or approved by a non-interested majority of the Board;

(4)     Class A Common Units or Convertible Securities actually issued upon the exercise of Options or Class A Common Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(5)     Class A Common Units issued upon the conversion of other classes of Units;

(6)     Class A Common Units issued or issuable in the Initial Public Offering;

(7)     Class A Common Units or Class B Common Units issued or issuable pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided, that such issuances are approved by the Board;

(8)     Class A Common Units or Class B Common Units issued or issuable to banks, equipment lessors, real property lessors, financial institutions or other persons engaged in the business of making loans pursuant to a debt financing, commercial leasing or real property leasing transaction approved by the Board;

(9)     Class A Common Units or Class B Common Units issued or issuable in connection with any settlement of any action, suit, proceeding or litigation approved by the Board;

(10)     Class A Common Units or Class B Common Units issued or issuable in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships approved by the Board; and

23

(11)     Class A Common Units or Class B Common Units issued or issuable to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board.

(ii)     <u>No Adjustment of Class D Conversion Price</u>.  No adjustment in the Class D Conversion Price shall be made as the result of the issuance or deemed issuance of Additional Common Units if the Company receives written notice from the holders of at least a majority of the then outstanding Class D Preferred Units agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Common Units.

(iii)     Deemed Issue of Additional Common Units.

(a)     If the Company at any time or from time to time after the Class D Original Issue Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of Class A Common Units (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Common Units issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)     If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the Class D Conversion Price pursuant to the terms of <u>Section 6.4(d)(iv)</u>, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of Class A Common Units issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Company upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the Class D Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such Class D Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security.  Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the Class D Conversion Price to an amount which exceeds the lower of (i) the Class D Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the Class D Conversion Price that would have resulted from any issuances of Additional Common Units (other than deemed issuances of Additional Common Units as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

24

(c)     If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the Class D Conversion Price pursuant to the terms of Section 6.4(d)(iv) (either because the consideration per unit (determined pursuant to Section 6.4(d)(v)) of the Additional Common Units subject thereto was equal to or greater than the Class D Conversion Price then in effect, or because such Option or Convertible Security was issued before the Class D Original Issue Date), are revised after the Class D Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of Class A Common Units issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Common Units subject thereto (determined in the manner provided in Section 6.4(d)(iii) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(d)     Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the Class D Conversion Price pursuant to the terms of Section 6.4(d)(iv), the Class D Conversion Price shall be readjusted to such Class D Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e)     If the number of Class A Common Units issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the Class D Conversion Price provided for in this Section 6.4(d)(iii) shall be effected at the time of such issuance or amendment based on such number of units or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (2) and (3) this Section 6.4(d)(iii)).  If the number of Class A Common Units issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the Class D Conversion Price that would result under the terms of this Section 6.4(d)(iii) at the time of such issuance or amendment shall instead be effected at the time such number of units and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the Class D Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

(iv)     Adjustment of Class D Conversion Price Upon Issuance of Additional Common Units.  In the event the Company shall at any time after the Class D Original Issue Date issue Additional Common Units (including Additional Common Units deemed to be issued pursuant to Section 6.4(d)(iii)), without consideration or for a consideration per unit less than the Class D Conversion Price in effect immediately prior to such issue, then the

25

Class D Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a)     "$CP_2$" shall mean the Class D Conversion Price in effect immediately after such issue of Additional Common Units;

(b)     "$CP_1$" shall mean the Class D Conversion Price in effect immediately prior to such issue of Additional Common Units;

(c)     "A" shall mean the number of Class A Common Units and/or Class B Common Units outstanding immediately prior to such issue of Additional Common Units (treating for this purpose as outstanding all Class A Common Units and/or Class B Common Units issuable upon exercise of Options outstanding immediately prior to such issue or upon conversion or exchange of Convertible Securities (including the Class C Common Units and Class D Preferred Units) outstanding (assuming exercise of any outstanding Options therefor) immediately prior to such issue);

(d)     "B" shall mean the number of Additional Common Units that would have been issued if such Additional Common Units had been issued at a price per unit equal to $CP_1$ (determined by dividing the aggregate consideration received by the Company in respect of such issue by $CP_1$); and

(e)     "C" shall mean the number of such Additional Common Units issued in such transaction.

(v)     <u>Determination of Consideration</u>.     For purposes of this <u>Section 6.4(d)</u>, the consideration received by the Company for the issue of any Additional Common Units shall be computed as follows:

(a)     <u>Cash and Property</u>:  Such consideration shall:

(1)     insofar as it consists of cash, be computed at the aggregate amount of cash received by the Company, excluding amounts paid or payable for accrued interest;

(2)     insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board; and

(3)     in the event Additional Common Units are issued together with other shares or securities or other LLC Assets for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board.

26

(b)    <u>Options and Convertible Securities</u>.  The consideration per unit received by the Company for Additional Common Units deemed to have been issued pursuant to <u>Section 6.4(d)(iii)</u>, relating to Options and Convertible Securities, shall be determined by dividing:

(1)    The total amount, if any, received or receivable by the Company as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(2)    the maximum number of Class A Common Units (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

(vi)    <u>Multiple Closing Dates</u>.  In the event the Company shall issue on more than one date Additional Common Units that are a part of one transaction or a series of related transactions and that would result in an adjustment to the Class D Conversion Price pursuant to the terms of <u>Section 6.4(d)(iv)</u> then, upon the final such issuance, the Class D Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

(e)    <u>Adjustment for Unit Splits and Combinations</u>.  If the Company shall at any time or from time to time after the Class D Original Issue Date effect a subdivision of the outstanding Class A Common Units, the Class D Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of Class A Common Units issuable on conversion of each unit of such class shall be increased in proportion to such increase in the aggregate number of Class A Common Units outstanding.  If the Company shall at any time or from time to time after the Class D Original Issue Date combine the outstanding Class A Common Units, the Class D Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of Class A Common Units issuable on conversion of each unit of such class shall be decreased in proportion to such decrease in the aggregate number of Class A Common Units outstanding.  Any adjustment under this subsection shall become effective at the close of business on the date the subdivision or combination becomes effective.

(f)    <u>Adjustment for Certain Dividends and Distributions</u>.  In the event the Company at any time or from time to time after the Class D Original Issue Date shall make or issue, or fix a record date for the determination of holders of Class A Common Units entitled to receive, a dividend or other distribution payable on the Class A Common Units in Additional

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 34 of 81

Common Units, then and in each such event the Class D Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Class D Conversion Price then in effect by a fraction:

(i)    the numerator of which shall be the total number of Class A Common Units issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

(ii)    the denominator of which shall be the total number of Class A Common Units issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of Class A Common Units issuable in payment of such dividend or distribution.

Notwithstanding the foregoing (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Class D Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Class D Conversion Price shall be adjusted pursuant to this subsection as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Class D Preferred Units simultaneously receive a dividend or other distribution of Class A Common Units in a number equal to the number of Class A Common Units as they would have received if all outstanding Class D Preferred Units had been converted into Class A Common Units on the date of such event.

(g)    Adjustments for Other Dividends and Distributions.  In the event the Company at any time or from time to time after the Class D Original Issue Date shall make or issue, or fix a record date for the determination of holders of Class A Common Units entitled to receive, a dividend or other distribution payable in securities of the Company (other than a distribution of Class A Common Units in respect of outstanding Class A Common Units) or in other property and the provisions of Section 5 do not apply to such dividend or distribution, then and in each such event the holders of Class D Preferred Units shall receive, simultaneously with the distribution to the holders of Class A Common Units, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding Class D Preferred Units had been converted into Class A Common Units on the date of such event.

(h)    Adjustment for Merger or Reorganization, etc.  Subject to the provisions of Section 6.2(c), if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Company in which the Class A Common Units (but not the Class D Preferred Units) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Sections 6.4(d), 6.4(f), or 6.4(g), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each Class D Preferred Unit shall thereafter be convertible in lieu of the Class A Common Units into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of Class A Common Units of the Company issuable upon conversion of one Class D Preferred Unit immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive

28

pursuant to such transaction; and, in such case, appropriate adjustment (as determined in good faith by the Board) shall be made in the application of the provisions in this Section 6.4 with respect to the rights and interests thereafter of the holders of the Class D Preferred Units, to the end that the provisions set forth in this Section 6.4 (including provisions with respect to changes in and other adjustments of the Class D Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Class D Preferred Units.

(i)     Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Class D Conversion Price pursuant to this Section 6.4, the Company at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Class D Preferred Units a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Class D Preferred Units is convertible) and showing in detail the facts upon which such adjustment or readjustment is based.  The Company shall, as promptly as reasonably practicable after the written request at any time of any holder of Class D Preferred Units (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the Class D Conversion Price then in effect, and (ii) the number of Class A Common Units and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Class D Preferred Units.

(j)     Class C and Class D Notice of Record Date.  In the event:

(i)     the Company shall take a record of the holders of its Class A Common Units (or other capital stock or securities at the time issuable upon conversion of the Class C Common Units or Class D Preferred Units) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

(ii)     of the Initial Public Offering; or

(iii)     of any capital reorganization of the Company, any reclassification of the Class A Common Units of the Company, or any Deemed Liquidation Event; or

(iv)     of the voluntary or involuntary dissolution, liquidation or winding-up of the Company,

then, and in each such case, the Company will send or cause to be sent to the holders of the Class C Common Units and Class D Preferred Units a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such Initial Public Offering, reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Class A Common Units (or such other capital stock or securities at the time issuable upon the conversion of the Class C Common Units or Class D Preferred Units) shall be entitled to exchange their Class A Common Units (or such other capital stock or securities) for securities

Case: 17-31272    Doc# 124    Filed: 03/21/18    Entered: 03/21/18 12:10:21    Page 36 of 81

or other property deliverable upon such Initial public Offering, reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up, and the amount per unit and character of such exchange applicable to the Class C Common Units, Class D Preferred Units and the Class A Common Units.  Such notice shall be sent at least ten (10) days prior to the record date or effective date for the event specified in such notice.

(a)     The notice provisions set forth in this <u>Section 6.4(j)</u> as applied to the Class C Common Units may be shortened or waived prospectively or retrospectively by the vote or written consent of the holders of at least sixty percent (60%) of the Class C Common Units, voting together as a class.

6.5.     <u>Class D Mandatory Conversion</u>.

(a)     <u>Trigger Events</u>.   Upon either (a) the closing of the sale of Class A Common Units to the public in a firm-commitment underwritten public offering pursuant to an effective registration statement under the Securities Act, resulting in at least $35 million of gross proceeds to the Company or (b) the date and time, or the occurrence of an event, specified by vote or written consent of the holders of at least majority of the then outstanding Class D Preferred Units (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the "<u>Class D Mandatory Conversion Time</u>"), then

(i)     all outstanding Class D Preferred Units shall automatically be converted into Class A Common Units, at the then effective conversion rate as calculated pursuant to <u>Section 6.4(a)(i),</u> and

(ii)     such units may not be reissued by the Company.

(b)     <u>Procedural Requirements</u>.  All holders of record of Class D Preferred Units shall be sent written notice of the Class D Mandatory Conversion Time and the place designated for mandatory conversion of all such Class D Preferred Units pursuant to this <u>Section 6.5</u>.  Such notice need not be sent in advance of the occurrence of the Class D Mandatory Conversion Time.  Upon receipt of such notice, each holder of Class D Preferred Units in certificated form shall surrender his, her or its certificate or certificates for all such units (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such certificate) to the Company at the place designated in such notice.  If so required by the Company, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Company, duly executed by the registered holder or by his, her or its attorney duly authorized in writing.  All rights with respect to the Class D Preferred Units converted pursuant to <u>Section 6.5(a)</u>, including the rights, if any, to receive notices and vote (other than as a holder of Class A Common Units), will terminate at the Class D Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided

30

for in the next sentence of this Section 6.5(b). As soon as practicable after the Class D Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Class D Preferred Units, the Company shall (a) issue and deliver to such holder, or to his, her or its nominees, a certificate or certificates for the number of full Class A Common Units issuable on such conversion in accordance with the provisions hereof and (b) pay cash as provided in Section 6.4(b) in lieu of any fraction of a Class A Common Unit otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the Class D Preferred Units converted. Such converted Class D Preferred Units shall be retired and cancelled and may not be reissued as units of such series, and the Company may thereafter take such appropriate action (without the need for Member action) as may be necessary to reduce the authorized number of Class D Preferred Units accordingly.

6.6. **Redeemed or Otherwise Acquired Shares.** Any Class C Common Units or Class D Preferred Units that are redeemed or otherwise acquired by the Company or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred. Neither the Company nor any of its subsidiaries may exercise any voting or other rights granted to the holders of Class C Preferred Units or Class D Preferred Units following redemption.

## ARTICLE VII

## MANAGEMENT; MEMBERS

7.1. **Management by Board.** Except for decisions or actions requiring the approval of the Members as provided in this Agreement or by nonwaivable provisions of the Delaware LLC Act, the Board shall have full power and authority to manage and supervise the business and affairs of the Company. Except as otherwise approved by the Board, the Board shall be composed of five (5) Directors, appointed as set forth in this Article VII. The Board may delegate such powers and authority to the officers of the Company as are appropriate to facilitate the operations and related business activities of the Company, consistent with the terms of this Agreement. The officers of the Company shall exercise such delegated powers and authority in a manner consistent with the policies adopted from time to time by the Board. The Board shall retain the right to revoke any delegation granted hereunder at any time and to reverse or overrule (if possible) any action taken by an officer of the Company pursuant to delegated authority.

7.2. **No Management by Members.** Except as otherwise expressly provided in this Agreement or by nonwaivable provisions of the Delaware LLC Act, the Members shall have no right to control or manage, nor shall take part in the control or management of, the property, business or affairs of the Company.

7.3. **Directors.** The Directors shall be elected, and may be removed, as provided in Section 7.15.

7.4. **Managers under the Delaware LLC Act.** Each Director shall be a "manager" of the Company for all purposes of, and within the meaning set forth in, the Delaware LLC Act.

31

7.5.    <u>Powers of the Board</u>.  The Board may, except as otherwise required by law, exercise all such powers and do all such acts and things as may be exercised or done by the Company, including, without limiting the generality of the foregoing (each of which in <u>Subsections 7.5(a)</u> through <u>7.5(g)</u> requires approval from the Board or a committee thereof if permissible under law and this Agreement, unless otherwise set forth in this agreement), the unqualified power:

(a)    To declare dividends from time to time in accordance with law and this Agreement, including without limitation <u>Sections 5.5</u> and <u>7.16</u>;

(b)    To purchase or otherwise acquire any property, rights or privileges on such terms as it shall determine;

(c)    To authorize the creation, making and issuance, in such form as it may determine, of written obligations of every kind, negotiable or non-negotiable, secured or unsecured, to borrow funds and guarantee obligations, and to do all things necessary in connection therewith, subject to <u>Section 7.16</u>;

(d)    To remove any officer of the Company with or without cause, subject to the payment of any obligations to an officer under any contract of employment;

(e)    To confer upon any officer of the Company the power to appoint, remove and suspend subordinate officers, employees and agents;

(f)    To adopt from time to time such Unit, option, Unit purchase, bonus or other compensation plans for Directors, officers, employees and agents of the Company and its subsidiaries as it may determine;

(g)    To adopt from time to time such insurance, retirement, and other benefit plans for Directors, officers, employees and agents of the Company and its subsidiaries as it may determine; and

(h)    To adopt from time to time regulations, not inconsistent with this Agreement, for the management of the Company's business and affairs.

7.6.    <u>Committees of the Board</u>.  The Board, by a vote of a majority of the Directors, may from time to time designate committees of the Board, with such lawfully delegable powers and duties as it thereby confers, to serve at the pleasure of the Board and shall, for those committees and any others provided for herein, elect a Director or Directors to serve as the member or members, designating, if it desires, other Directors as alternate members who may replace any absent or disqualified Director at any meeting of the committee.  Any such committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the Certificate of Formation, adopting an agreement of merger or consolidation, recommending to the Members the sale, lease or exchange of all or substantially all of the LLC Assets, recommending to the Members a dissolution of the Company or a revocation of a dissolution, or

32

amending this Agreement. Subject to the other provisions of this Agreement, including without limitation Sections 5.5 and 7.16, any committee so designated may exercise the power and authority of the Board to declare a dividend or to authorize the issuance of Units if the resolution which designates the committee or a supplemental resolution of the Board shall so provide. In the absence or disqualification of any member of any committee and any alternate member in his or her place, the member or members of the committee present at the meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may by unanimous vote appoint another Director to act at the meeting in the place of the absent or disqualified Director.

       7.7.   Term; Vacancies; Removal.

       (a)   Each Director of the Company shall hold office until his or her death, incapacity, resignation or removal, or until his or her successor shall have been duly elected and qualified.

       (b)   Vacancies on the Board may be filled as provided in Section 7.15.

       (c)   Any Director may resign at any time by giving written notice to the Board or to the Company. Any such resignation shall take effect at the time specified therein or, if no time is specified, upon receipt thereof; and unless specified therein, acceptance of such resignation shall not be necessary to make it effective.

       (d)   Any or all of the Directors may be removed, with or without cause, by the holders of a majority Voting Units then entitled to vote at an election of Directors, unless otherwise specified by law or this Agreement; provided that no Director who has guaranteed a continuing financial obligation of the Company may be removed without his or her prior consent unless the Company shall have first obtained a full and complete release of such Director from such guaranty.

       7.8.   Meetings of the Board. The Board shall meet no less frequently than four (4) times per year at such places and at such dates as are established by the Board. Regularly scheduled meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board. Special meetings of the Board for any purpose or purposes may be called at the request of the Manager or a majority of the Directors on not less than twenty-four (24) hours' notice to the other Directors. Notice of the time and place of special meetings shall be: (i) delivered personally by hand, by courier or by telephone; (ii) sent by United States first-class mail, postage prepaid; (iii) sent by facsimile; or (iv) sent by electronic mail, directed to each Director at that Director's address, telephone number, facsimile number or electronic mail address, as the case may be, as shown on the Company's records. If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile or (iii) sent by electronic mail, it shall be delivered or sent at least at least 24 hours before the time of the holding of a special meeting. If the notice is sent by United States mail, it shall be deposited in the United States mail at least 10 calendar days before the time of the holding of the special meeting. Notice of a special meeting need not be given to any Director who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto

or at its commencement, the lack of notice to such Director. Meetings of the Board may be held by telephone or any other communications equipment by means of which all participating Directors can simultaneously hear each other during the meeting.

7.9. <u>Procedure</u>. The Board may establish rules of procedure consistent with the terms and conditions of this Agreement pursuant to which it shall conduct its proceedings.

7.10. <u>Voting and Quorum</u>. Each Director shall be entitled to cast one vote. At all properly noticed meetings of the Board, the presence, in person or by proxy, of a majority of the Directors shall constitute a quorum for the transaction of business and decisions shall be taken by a majority vote of all of the Directors in office, regardless of the number of Directors present. In the event of a dead lock among the Directors with respect to a particular item being considered, the item shall be submitted to a vote of the Class A Members.

7.11. <u>Waivers of Notice</u>. Whenever the giving of any notice to Directors is required by statute or this Agreement, a waiver thereof, in writing and delivered to the Company signed by the Person or Persons entitled to said notice, whether before or after the event as to which such notice is required, shall be deemed equivalent to notice. Attendance of a Director at a meeting without objection, or execution of a written consent to any action, shall constitute a waiver of notice of such meeting or action.

7.12. <u>Compensation</u>. The compensation of the Directors for their services to the Company shall be determined by the Compensation Committee of the Board, if in existence at such time, or by the Board as a whole, in its sole discretion and in good faith. Directors shall, however, be reimbursed by the Company for any reasonable expenses (including travel expenses) that are incurred by such Directors in the performance of their duties hereunder (including attendance at meetings of the Board). Nothing contained in this Agreement shall be construed to preclude any Director from serving the Company in any other capacities and receiving compensation for such services.

7.13. <u>Action by Written Consent</u>. Any action which may be taken by the Directors under this Agreement may be taken without a meeting if all of the Directors on the Board or any committee of the Board, as the case may be, consent thereto in writing and the writing or writings are delivered to the Company. The Company shall file such writings with the minutes of proceedings of the Board.

7.14. <u>Manager</u>.

(a) The day to day operations of the Company and its business will be managed by a manager of the Company (the "<u>Manager</u>"). The Manager shall have substantially the same powers and authority as a Chief Executive Officer and President. The initial Manager of the Company will be Rolf O. Ehrhardt. The Manager shall hold his office until he resigns or is removed by affirmative vote of the majority of the Board. The Manager, in the capacity of Manager, shall not be a "manager" of the Company for any purposes of, or within the meaning set forth in, the Delaware LLC Act; <u>provided</u> that nothing in this <u>Section 7.14(a)</u> shall be construed to prevent the Manager from also serving as a Director of the Company.

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 41 of 81

(b)     The Board may appoint such other officers and agents of the Company, each with such duties, powers and authority, as the Board shall deem necessary or appropriate to carry out the business of the Company upon such terms and conditions the Board may determine. Any such officer or agent shall hold his or her respective position for the term specified by the Board unless earlier removed by the Board.

(c)     Any officer or agent of the Company may resign at any time by giving written notice to the Board or to the Company.  Any such resignation shall take effect at the time specified therein or, if no time is specified, upon receipt thereof; and unless specified therein, acceptance of such resignation shall not be necessary to make it effective.

(d)     Except as otherwise stated herein, any Manager, officer or agent of the Company may be removed from office, with or without cause, by the Board at a meeting called for that purpose.  Any vacancy occurring in any office may be filled by a person designated by the Board.  The Board in its sole and absolute discretion may transfer the power and duties, in whole or in part, of the Manager and any officer to any other officer, or persons, notwithstanding the provisions of this Agreement, except as otherwise provided by the laws of the State of Delaware.

(e)     The Manager and officers of the Company shall be entitled to such salary or other compensation as the Board shall determine.

(f)     Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager and the officers of the Company as set forth herein.

7.15.    Voting Rights of Class A Members and Class D Members; Actions requiring Members' Consent; Meetings of Members.

(a)     Class A Members shall have voting rights and shall be entitled to one vote per Class A Common Units Unit held.  Class D Members shall be entitled to cast the number of votes equal to the number of whole Class A Common Units into which the Class D Preferred Units held by such holder are convertible as of the record date for determining Members entitled to vote on such matter.  Except as provided by law or by the other provisions of this Agreement, holders of Class D Preferred Units shall vote together with the holders of Class A Common Units as a single class.

(i)     Consistent with the above and with Section 18-216 of the Delaware LLC Act, Class A Members and Class D Members voting as a single class shall have exclusive voting rights to authorize the reorganization or a conversion of the Company from a limited liability company into a corporation.

(b)     Holders of Class B Common Units and Class C Common Units shall have no voting rights other than those required by the Delaware LLC Act. For the avoidance of doubt, such holders shall have no voting rights regarding the following non-exhaustive list:

(i)     Any transaction or series of transactions to liquidate, dissolve or wind-up the business and affairs of the Company, or effect any merger or consolidation;

35

(ii)     amend, alter or repeal any provision of this Agreement of the Company;

(iii)    authorize the reorganization or conversion of the Company from a limited liability company into a corporation; or

(iv)    elect Directors to the Board.

(c)     Election of Directors.  The Class A Members and any other class or series of voting units (including the Class D Members), exclusively and voting together as a single class, shall be entitled to elect the total number of directors of the Company.  At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding units of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director.  Except as otherwise provided in this Article 7, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or series or by any remaining director or directors elected by the holders of such class or series pursuant to this Article 7.

(d)     Affiliate Transactions.  Any material agreements or transactions or any business venture of any kind between the Company, on the one hand, and any Member and/or any of their Affiliates (other than the Company and any of its subsidiaries), on the other hand, shall be subject to consent of the holders of Voting Units, exclusively and voting together as a single class, pursuant to Subsection 7.15(e) or (g), as applicable, and shall be entered into and performed on an arms-length basis; provided, however, transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a non-interested majority of the Board shall not be subject to the consent of the holders of Voting Units.

(e)     A meeting of the Members may be called at any time by the Board or Manager.  Meetings of the Members shall be held at the Company's principal place of business or at any other place designated by the Board or the Manager.  Not less than five nor more than sixty calendar days before each meeting, the Person or Persons calling the meeting shall give written notice of the meeting to each Member, stating the place, date, hour and purpose of the meeting.  Notice shall be: (i) delivered personally by hand, by courier or by telephone; (ii) sent by United States first-class mail, postage prepaid; (iii) sent by facsimile; or (iv) sent by electronic mail, directed to each Member at that Member's address, telephone number, facsimile number or electronic mail address, as the case may be, as shown on the Company's records. If the notice is sent by United States mail, it shall be deposited in the United States mail at least 10 calendar days before the time of the holding of the meeting. Notwithstanding the foregoing provisions, each Member waives notice if, before or after the meeting, the Member signs a waiver of the notice which is filed with the records of meetings of Members, or is present at the meeting in person or by proxy without objecting to the lack of notice.  Unless this Agreement provides otherwise, the presence in person or by proxy of Members holding not less than a majority of the issued and outstanding Voting Units constitutes a quorum and decisions shall be taken by Members holding a majority of the Units entitled to vote which are represented at the meeting.

36

A Member may vote either in person or by written proxy signed by the Member or the Member's duly authorized attorney in fact.

(f)     A meeting of the Members need not be held at any time, except as called pursuant to Section 7.15(e).

(g)     Any action which may be taken by the Members at a meeting of Members may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken shall have been signed by the holders of not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all units entitled to vote thereon were present and voted.  Prompt notice of any such action taken shall be given to all Members entitled to vote.

(h)     Members may participate in a meeting by conference telephone or any other  communications equipment, by means of which all Persons participating in the meeting can simultaneously hear each other during the meeting, and such participation shall constitute presence in person at such meeting.

7.16.  Class D Preferred Units Unit Protective Provisions.  At any time when at least 51% of the Class D Preferred Units issued on the Class D Original Issue Date (subject to appropriate adjustment in the event of any unit dividend, unit split, combination or other similar recapitalization with respect to the Class D Preferred Units) are outstanding, the Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then outstanding Class D Preferred Units (subject to any Super Majority Class D Vote as specified below), given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

(a)     liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or any other Deemed Liquidation Event (as defined in Article VI), or consent to or enter into any agreement to do any of the foregoing, except if the proceeds payable to the holders of the Class D Preferred Units at the initial closing of such event exceed the aggregate Class D Liquidation Amount; provided, however, that (x) if the gross proceeds payable to the holders of the Class D Preferred Units in any merger or consolidation or any other Deemed Liquidation Event are less than the aggregate Class D Liquidation Amount and (y) the Class D Investor is the acquirer in such transaction, then the Super Majority Class D Vote shall be required;

(b)     amend, alter or repeal any provision of this Agreement of the Company in a manner that adversely affects the powers, preferences or rights of the Class D Preferred Units or enter into any agreement to do the foregoing;

(c)     (i) the Super Majority Class D Vote shall be required to create, or authorize the creation of, or issue or obligate itself to issue units of, any additional class or series of units unless the same ranks junior to the Class D Preferred Units with respect to the

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 44 of 81

distribution of assets on the liquidation, dissolution or winding up of the Company, and payment of dividends and rights of redemption unless either (x) such issuance (or obligation to issue) is part of a bona fide financing transaction for which the primary purpose is raising capital, as reasonably determined by a non-interested majority of the Board or (y) all Additional Class D Investors are given the opportunity to participate in such transaction, then in the case of either (x) or (y) above, the Super Majority Class D Vote shall not be required under this Section 7.16(c)(i), and instead the written consent or affirmative vote of the holders of at least a majority of the then outstanding Class D Preferred Units as provided above in the first paragraph of this Section 7.16 shall be required under this Section 7.16(c)(i), (ii) increase the authorized number of Class D Preferred Units or increase the authorized number of units of any additional class or series of units unless the same ranks junior to the Class D Preferred Units with respect to the distribution of assets on the liquidation, dissolution or winding up of the Company, the payment of dividends and rights of redemption, or (iii) enter into any agreement to do the foregoing;

(d)    (i) reclassify, alter or amend any existing security of the Company that is pari passu with the Class D Preferred Units in respect of the distribution of assets on the liquidation, dissolution or winding up of the Company, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to the Class D Preferred Units in respect of any such right, preference, or privilege or (ii) reclassify, alter or amend any existing security of the Company that is junior to the Class D Preferred Units in respect of the distribution of assets on the liquidation, dissolution or winding up of the Company, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to or pari passu with the Class D Preferred Units in respect of any such right, preference or privilege or (iii) or enter into any agreement to do the foregoing;

(e)    purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any Units of the Company or enter into any agreement to do the foregoing other than (i) redemptions of or dividends or distributions on the Class D Preferred Units as expressly authorized herein, (ii) dividends or other distributions payable on the Class A Common Units solely in the form of additional Class A Common Units, (iii) repurchases of units from former employees, officers, directors, consultants or other persons who performed services for the Company or any subsidiary in connection with the cessation of such employment or service other than pursuant to the provisions of existing equity incentive plans existing on the Class D Original Issue Date or (iv) as approved by a non-interested majority of the Board; provided, however, that if  the Class D Preferred Units are not redeemed on a pro rata basis, then the Super Majority Class D Vote shall be required;

(f)    create, or authorize the creation of, or issue, or authorize the issuance of, or guarantee or authorize the guarantee of, or endorse or otherwise become directly or contingently liable on, any debt security, or permit any subsidiary to take any such action with respect to any debt security or enter into any agreement to do the foregoing, if the aggregate indebtedness of the Company and its subsidiaries for borrowed money incurred in any year following such action would exceed $150,000; provided, however, that if the Class D Investor is a lender in any transaction contemplated by this Section 7.16(f), then the Super Majority Class D Vote shall be required;

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 45 of 81

(g)    pledge, hypothecate or create any lien, security interest in or encumbrance or enter into any agreement to do the foregoing  on (1) assets of the Company in the aggregate in excess of $150,000, other than security interests in connection with purchases made by the Company(provided that nothing in this clause (g)(1) shall be deemed to permit the Company to take any action that would otherwise be subject to Section 7.16(f) unless such action is taken in compliance therewith) or (2) any of the Company's intellectual property; provided, however, that if the Class D Investor is a secured party in any transaction contemplated by this Section 7.16(g), then the Super Majority Class D Vote shall be required;

(h)    create, or hold capital stock in, any subsidiary that is not wholly owned (either directly or through one or more other subsidiaries) by the Company, or sell, transfer or otherwise dispose of any capital stock of any direct or indirect subsidiary of the Company, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or series of related transactions) of all or substantially all of the assets of such subsidiary, or enter into any agreement to do the foregoing; provided, however, that if the Class D Investor owns a portion of any such subsidiary of the Company or is a purchaser of any assets of any such subsidiary in any transaction contemplated by this Section 7.16(h), then the Super Majority Class D Vote shall be required;

(i)    sell, license, assign, transfer or otherwise dispose of, or the grant of any rights in or to, the Company's intellectual property or intellectual property rights or enter into any agreement to do the foregoing, other than non-exclusive licenses in the ordinary course of business; provided, however, that if the Class D Investor is a purchaser, licensee, assignee or transferee in any transaction contemplated by this Section 7.16(i), then the Super Majority Class D Vote shall be required;

(j)    make any material change to the principal line of business of the Company, or enter into new material lines of business or an exit from a current line of business, or enter into any agreement to do the foregoing;

(k)    make any loan or advance to any officer, director, employee, consultant or any loan or advance in an amount of more than $100,000 individually or $200,000 per year in the aggregate to any other person, or any subsidiary or other corporation, partnership, person, individual or other entity or enter into any agreement to do the foregoing other than advances on expenses in the ordinary course of business or as approved by a non-interested majority of the Board; provided, however, that if the Class D Investor is the recipient of a loan or advance contemplated by this Section 7.16(k), then the Super Majority Class D Vote shall be required;

(l)    participate in, or be a party to, any transaction with any director, officer or employee of the Company or any Affiliate of any such person or enter into any agreement to do the foregoing except transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a non-interested majority of the Board; provided, however, that if the Class D Investor is involved in a transaction contemplated by this Section 7.16(l) then the Super Majority Class D Vote shall be required unless such transaction is (i) already subject to another subsection of this Section 7.16 or (ii) relates to the Supply Agreement.

(m)    increase the authorized number of Class A Common Units, Class B Common Units, or Class C Common Units or enter into any agreement to do the foregoing;

(n)    effect any dividend, unit split, combination or other similar Recapitalization (as defined in Article VI) on Class B Common Units or enter into any agreement to do the foregoing.

7.17.    <u>Indemnification of the Members, Directors, Managers, and any Affiliates</u>.

(a)    The Company shall indemnify and hold harmless to the fullest extent permitted by the laws of the State of Delaware, as if the Company were a corporation incorporated under the laws of the State of Delaware, any Member, Director, Manager, officer and/or any Affiliate thereof (individually, in each case, an "<u>Indemnitee</u>"), from and against any and all Losses arising out of or incidental to the business or activities of or relating to the Company, regardless of whether the Indemnitee continues to be a Member, Director, Manager, officer or Affiliate thereof at the time any such liability or expense is paid or incurred; <u>provided</u>, <u>however</u>, that no Member, Director, Manager, officer or Affiliate may be indemnified by the Company from and against any Losses which result from the gross negligence or willful misconduct of such Person.

(b)    No Director, Manager or officer shall have liability (personal or otherwise) to the Company or its Members for damages for any breach of duty in such capacity; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 7.17</u> shall eliminate or limit the liability of any Director, Manager or officer if a judgment or other final adjudication adverse to such Director, Manager or officer establishes that his or her acts or omissions constituted gross negligence or willful misconduct of such Person.

(c)    Expenses incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding subject to this <u>Section 7.17</u> shall, from time to time, upon request by the Indemnitee, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount, if it shall be determined in a judicial proceeding or a binding arbitration that such Indemnitee is not entitled to be indemnified as authorized in this <u>Section 7.17</u>.

(d)    The indemnification provided by this <u>Section 7.17</u> shall be in addition to any other rights to which an Indemnitee may be entitled under any other agreement, by vote of the Members, as a matter of law or equity, or otherwise, both as to an action in the Indemnitee's capacity as a Member, Manager, officer or Affiliate thereof, and as to an action in another capacity, and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

(e)    The Company may purchase and maintain insurance on behalf of the Members, Managers, officers and such other Persons as the Members shall determine against any liability that may be asserted against or expense that may be incurred by such Persons in connection with the offering of interests in the Company or the business or activities of the

40

Company, regardless of whether the Company would have the power to indemnify such Persons against such liability under the provisions of this Agreement.

(f)     An Indemnitee shall not be denied indemnification in whole or in part under this Section 7.17 or otherwise by reason of the fact that the Indemnitee had an interest in the transaction with respect to which the indemnification applies, if the transaction was otherwise permitted or not expressly prohibited by the terms of this Agreement.

(g)     The provisions of this Section 7.17 are for the benefit of the Indemnitees, their heirs, successors, assigns and administrators and shall not be deemed to create any rights for the benefit of any other Persons.

7.18.   Fiduciary Duties.  Each of the Directors, the Manager, and officers of the Company shall owe such fiduciary duties to the Company as would be owed by a director, officer, or employee of a corporation formed under the Delaware General Corporation Law, Delaware Code Title 8, Section 101 et seq., as amended, to such corporation.

7.19.   Savings Clause.  If this Article VII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article VII as to costs, charges and expenses (including, without limitation, attorneys' fees), judgments, fines and amounts paid in settlement with respect to any suit, action or proceeding relating to this Agreement, whether civil, criminal, administrative or investigative, to the fullest extent permitted by any applicable portion of this Article VII that shall not have been invalidated and to the fullest extent permitted by applicable law.

ARTICLE VIII

ADDITIONAL AGREEMENTS AND RESTRICTIONS

8.1.   Financial Statements; Other Reports.  The Company will maintain proper books of account and records in accordance with generally accepted accounting principles applied on a consistent basis, and will deliver to each Member:

(a)     as soon as available and in any event within forty-five (45) days after the end of each of the first three quarters of each fiscal year of the Company, an unaudited balance sheet of the Company as of the end of such quarter and the related unaudited statements of income and unitholders' equity and of cash flows of the Company for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding period of the preceding fiscal year and the budget for such current year, all in reasonable detail and prepared in accordance with generally accepted accounting principles consistently applied (subject to year-end adjustments);

(b)     as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Company, a copy of the annual unaudited financial statements for such year for the Company, including therein a balance sheet of the Company as of the end of such fiscal year and statements of income and unitholders' equity and of cash flows of the Company

41

for such fiscal year, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year, all in reasonable detail and prepared in accordance with generally accepted accounting principles consistently applied;

(c)     promptly upon receipt thereof, any written report submitted to the Company by independent public accountants in connection with an annual or interim audit of the books of the Company and its subsidiaries made by such accountants, if any; and

(d)     promptly after the commencement thereof, notice of all actions, suits and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would reasonably expected to lead to a material adverse effect on the Company.

Neither the foregoing provisions of this Section 8.1 nor any other provision of this Agreement shall be in limitation of any rights which a Member may have with respect to the books and records of the Company, or to inspect their properties or discuss their affairs, finances and accounts, under the laws of the jurisdictions in which they are incorporated.

8.2.    Inspection and Other Information.  Each Member and such agents, advisors and counsel as such Member may designate, may, at its expense, visit and inspect any of the properties of the Company, examine the books of account of the Company and discuss the affairs, finances and accounts of the Company with its officers and employees and public accountants at reasonable times and with reasonable prior notice during normal business hours. All such visits and inspections shall be conducted in a manner that does not unreasonably interfere with the normal business operations of the Company.  The Company will furnish to each such Member such other information as it from time to time may reasonably request.

8.3.    Issuance of Certificates.

(a)     Every Member of the Company shall be entitled to have a certificate certifying the number of Units owned by it in the Company.  The Unit certificates shall be numbered and registered in the ledger and transfer books of the Company as they are issued. The Board may also appoint one or more transfer agents and/or registrars for membership units of any class or classes and for the transfer and registration of certificates representing the same and may require certificates to be countersigned by one or more of them.   Certificates representing Units shall be signed by two officers of the Company.  Any or all of the signatures upon such certificate may be a facsimile, engraved or printed.

(b)     Replacement Certificates.  The Board may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Company alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming the certificates representing Units to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate of certificates, or his or her legal representative, to advertise the same in such manner as it shall require and/or to give the Company a bond in such sum as it may direct

as indemnity against any claim that may be made against the Company with respect to the certificates alleged to have been lost, stolen or destroyed.

(c)    <u>Transfers</u>.  Upon surrender to the Company of certificates duly endorsed or accompanied by proper evidence of succession, assignation or authority to Transfer, it shall be the duty of the Company, <u>provided</u> that the Transfer is in compliance with the terms of this Agreement, including, without limitation, the provisions of <u>Article VI</u> hereof, to issue new certificates to the person entitled thereto, cancel the old certificates and record the transaction upon its books.

(d)    <u>Rights of Registered Owner</u>.  The Company shall be entitled to recognize the exclusive right of a Person registered on its books as the owner of Units to receive distributions, and to vote as such owner, and to hold liable for calls and assessments a Person registered on its books as the owner of Units, and shall not be bound to recognize any equitable or other claim to or interest in such Unit or Units on the part of any other Person, whether or not it shall have express or other notice thereof.

(e)    <u>Legends</u>.  The certificates evidencing the Units shall bear the following legend:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, or applicable state securities laws and may not be transferred, sold or otherwise disposed of in the absence of an effective registration statement with respect to the securities evidenced by this certificate, filed and made effective under the Securities Act of 1933, as amended, and such applicable state securities laws, or unless the Company receives an opinion of counsel satisfactory to the Company to the effect that registration under such act and such applicable state securities laws is not required.

In addition, the securities represented by this certificate are subject to the restrictions on transfer set forth in the Limited Liability Company Operating Agreement, amended and restated as of March 11, 2014, as the same may be amended or restate from time to time, a copy of which is on file in the office of the Company."

The Company agrees that any certificates evidencing any Units or securities exchangeable for, or convertible into, such Units issued after the date hereof to any Person shall bear the foregoing legend.

## ARTICLE IX

## BANK ACCOUNTS; BOOKS AND RECORDS; STATEMENTS; TAXES; FISCAL YEAR

9.1.    <u>Bank Accounts</u>.  All funds of the Company shall be deposited in its name in such checking and savings accounts, time deposits or certificates of deposit, or other accounts as shall

43

be designated by the Board from time to time, and the Board shall arrange for the appropriate conduct of such account or accounts.

9.2.  <u>Books and Records</u>.  The Board shall keep, or cause to be kept, accurate, full and complete books and accounts showing assets, liabilities, income, operations, transactions and the financial condition of the Company.

9.3.  <u>Accounting Decisions</u>.  All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the Board.

9.4.  <u>Where Maintained</u>.  The books, accounts and records of the Company at all times shall be maintained at the Company's principal office or such other office or offices as the Board shall determine.

9.5.  <u>Tax Returns</u>.  The Board shall, at the expense of the Company, cause to be prepared and delivered to the Members, in a timely fashion after the end of each Fiscal Year (as defined below), copies of all federal and state income tax returns for the Company for such Fiscal Year, one copy of which shall be timely filed with the appropriate tax authorities.  Such returns shall accurately reflect the results of operations of the Company for such Fiscal Year. The Board shall appoint a "tax matters partner" (as defined in the Code) of the Company who is authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of the affairs of the Company by any federal, state, or local tax authorities, including any resulting administrative and judicial proceedings, and to expend funds of the Company for professional services and costs associated therewith.  The "tax matters partner" shall keep all Members fully informed of the progress of any such examination, audit or other proceeding, and each Member shall have the right to participate in such examination, audit or other proceeding.  Each Member and former Member agrees to cooperate with the "tax matters partner" and to do or refrain from doing any or all things reasonably required in connection with the conduct of such proceedings.

9.6.  <u>Fiscal Year</u>.  Unless otherwise required by law, the fiscal year of the Company for financial, accounting, U.S. federal, state and local income tax purposes shall be the calendar year (the "<u>Fiscal Year</u>").  The Board shall have authority to change the beginning and ending dates of the Fiscal Year if the Board deems such change to be necessary or appropriate to the business of the Company.

ARTICLE X

<u>DISSOLUTION AND LIQUIDATION</u>

10.1.  <u>Events Causing Dissolution</u>.  The Company shall not be dissolved by the admission of new Members or withdrawal of Members.  The Company shall be dissolved and its affairs wound up upon the occurrence of any of the following events:

(a)  subject to <u>Section 7.16(a)</u>, the affirmative vote of Class A Members and Class D Members as described in <u>Section 7.15</u>, consenting in writing to the termination of the Company; and

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 51 of 81

(b)     the occurrence of any event that, under the Delaware LLC Act, would cause the dissolution of the Company or that would make it unlawful for the business of the Company to be continued.

To the maximum extent permitted by the Delaware LLC Act, the Members hereby waive their rights to seek a judicial dissolution of the Company for reasons other than that listed in clause (a) of this Section 10.1.

Dissolution of the Company shall be effective as of the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until there has been a winding up of the Company's business and affairs, and the LLC Assets have been distributed as provided in Section 10.3 of this Agreement and in the Delaware LLC Act.

10.2.   Cancellation of Certificate.  Upon the dissolution and completion of the winding up of the Company, the Certificate of Formation shall be canceled in accordance with the provisions of Section 18-203 of the Delaware LLC Act, and the Board (or any Person responsible for winding up the affairs of the Company) shall promptly notify the Members of such dissolution.

10.3.   Distributions Upon Dissolution.  Upon the dissolution of the Company, the Board (or any other Person designated by the Board to be responsible for winding up the affairs of the Company) shall act as liquidator and proceed without any unnecessary delay to sell or otherwise liquidate the LLC Assets and pay or make due provision for the payment of all debts, liabilities and obligations of the Company.  The Board (or any other Person designated by the Board to be responsible for winding up the affairs of the Company) shall distribute the net liquidation proceeds and any other liquid LLC Assets after the payment of all debts, liabilities and obligations of the Company (including, without limitation, all amounts owing to a Member under this Agreement or under any agreement between the Company and a Member entered into by the Member other than in its capacity as a Member of the Company), the payment of expenses of liquidation of the Company, and the establishment of a reasonable reserve in an amount estimated by the Board to be sufficient to pay any amounts reasonably anticipated to be required to be paid by the Company, in accordance with Section 6.2.

10.4.   Deficit Restoration/Liability.  Except as otherwise specifically provided in this Agreement, a Member shall have no obligation to restore a negative balance in such Member's Capital Account at the time of dissolution of the Company and no liability to the Company or to any other Member in respect of a negative balance in such Member's Capital Account during the term of the Company or at the conclusion of the Company's termination.

ARTICLE XI

MISCELLANEOUS

11.1.   Specific Performance; Injunction; Payment of Costs.

(a)     Each Member shall be entitled to enforce its rights under this Agreement specifically and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the

45

provisions of this Agreement, and that each party may, in its sole discretion, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief in order to enforce or prevent any violation of the provisions of this Agreement.

(b)    In the event of a breach or threatened breach by a Member of any of the provisions of this Agreement, the Company, and the other Members shall be entitled to an injunction restraining such Member from any such breach. The availability of these remedies shall not prohibit the Company or any other Member from pursuing any other remedies available at law or in equity for such breach or threatened breach, including the recovery of damages from the breaching Member.

11.2.    Further Assurances.  At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any and all further instruments or documents and to take any and all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder.

11.3.    Termination; Survival.  The rights and obligations of a Member under this Agreement shall terminate at such time as such Member no longer is the beneficial owner of any Units.  Subject to Section 7.16, this Agreement shall terminate upon the earlier of (a) the date on which a majority of the Class A Members and Class D Members, voting as described in Section 7.15, and the Company agree in writing to terminate this Agreement, and (b) the sale of all or substantially all of the LLC Assets, provided that prior to such termination, the proceeds of such sale are liquidated and distributed to the Members pursuant to the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement, regardless of the manner in which this Agreement is terminated, the terms of Sections 6.2, 7.17, 7.18, 11.2, 11.3, 11.5, 11.6, 11.7, 11.8, 11.9 and 11.11 hereof shall survive until, by their respective terms, they are no longer operative.

11.4.    Benefits of Agreement.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  This Agreement is for the sole benefit of the parties hereto and not for the benefit of any third party.

11.5.    Enforceability.  It is the desire and intent of the parties hereto that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

11.6.    GOVERNING LAW.  THIS AGREEMENT SHALL BE INTERPRETED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAWS PROVISIONS THEREOF).

46

11.7. <u>CONSENT TO JURISDICTION</u>. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL AND STATE COURT IN CALIFORNIA SITTING IN SAN FRANCISCO COUNTY AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE LITIGATED IN SUCH COURTS. EACH PARTY HERETO IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING IN ANY SUCH COURT AND HEREBY FURTHER IRREVOCABLY AND UNCONDITIONALLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION, SUIT OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO CONSENTS TO PROCESS BEING SERVED IN ANY SUCH ACTION OR PROCEEDING BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL.

11.8. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OF THE OTHER PARTIES HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY OF THE OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.8</u>.

11.9. <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing and sufficient if delivered personally or sent by telecopy (with confirmation of receipt) or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to the Company: | BioCision, LLC<br>775 E. Blithedale Ave., Suite 203<br>Mill Valley, CA 94941<br>Attention: Manager<br>Telecopy: |
| with a copy to: | Wilson Sonsini Goodrich & Rosati, P.C.<br>650 Page Mill Road<br>Palo Alto, California 94304<br>Attn: Herbert Fockler, Esq.<br>(650) 493-9300 (Telephone)<br>(650) 493-6811 (Fax) |

If to a Member, at the Member's most current address provided to the Company; or to such other

47

address or telecopy number as the party to whom notice is to be given may have furnished to the other party in writing in accordance herewith. Each such notice, request or communication shall be effective when received or, if given by mail, when delivered at the address specified in this Section 11.9 or on the fifth business day following the date on which such communication is posted, whichever occurs first.

11.10. <u>Amendments and Waivers</u>. Subject to <u>Section 7.16</u>, this Agreement may only be modified or amended with (a) the written consent of the majority of the Class A Holder and Class D Holders as described in <u>Section 7.15</u> and (b) a Super Majority Class D Vote for Subsections <u>7.16(a)</u>, <u>7.16(c)</u>, <u>7.16(e)</u>, <u>7.16(f)</u>, <u>7.16(g)</u>, <u>7.16(h)</u>, <u>7.16(i)</u>, <u>7.16(k)</u>, <u>7.16(l)</u>. Any such supplemental or amendatory agreement shall be adhered to and have the same effect from and after its effective date as if the same had originally been embodied in, and formed a part of, this Agreement; <u>provided</u>, <u>however</u>, that the Board may, in its sole discretion, modify or amend this Agreement if such modifications or amendments are (i) of an inconsequential nature, as reasonably determined by the Board, and which would not adversely affect the powers, preferences or rights of any Member; (ii) for the purpose of reflecting the admission of additional Members, the withdrawal of Members, or additions to or reductions from the Capital Accounts of the Members, as any of the foregoing is permitted by this Agreement; (iii) necessary to maintain the Company's status as a partnership according to § 7701(a)(2) of the Code; (iv) necessary to preserve the validity of any and all allocations of Company income, gain, loss or deduction pursuant to § 704(b) of the Code; (v) contemplated by this Agreement; (vi) for the purposes of reflecting changes to the information set forth on the Schedules hereto; or (vii) to accommodate a change in any federal or state law, or the laws of another jurisdiction, affecting the operations of the Company. The Board shall give written notice to all Members promptly after any amendment has become effective. Any amendment to this Agreement must be in writing.

11.11. <u>Exculpation</u>. No Member, Director or Manager shall have personal liability to the Company or the Members for monetary damages for breach of such Member's, Director's or Manager's fiduciary duty (if any) or for any act or omission performed or omitted by such Person in good faith on behalf of the Company. Each Member, Director or Manager shall be indemnified and exculpated from personal liability for damages in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters that such Member, Director or Manager reasonably believes are within such Person's professional or expert competence.

11.12. <u>Compliance with Delaware LLC Act</u>. Each Member agrees not to take any action or fail to take any action which, considered alone or in the aggregate with other actions or events, would result in the termination of the Company under the Delaware LLC Act.

11.13. <u>Descriptive Headings</u>. Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement. All references to any "Section", "Article" or "Schedule" are to Sections, Articles and Schedules, respectively, to this Agreement.

11.14. <u>Entire Agreement</u>. Except as otherwise stated herein, this Agreement contains the entire agreement among the parties with respect to the subject matter hereof.

Case: 17-31272   Doc# 124   Filed: 03/21/18   Entered: 03/21/18 12:10:21   Page 55 of 81

11.15. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

11.16. <u>Company Opportunity</u>.

(a)     If the Class D Investor or any of its Affiliates (1) acquires knowledge of a potential transaction or matter that may be a Company Opportunity or (2) is then otherwise exploiting a Company Opportunity:

(i)     the Company shall have no expectation that such Company Opportunity will be offered to it, and

(ii)     the Class D Investor and its Affiliates (1) shall have no duty to communicate or present such Company Opportunity to the Company, shall have the right to hold such Company Opportunity for the Class D Investor's (and its officers', directors', agents', stockholders', Affiliates' or subsidiaries') own account, or to recommend, assign or otherwise transfer such Company Opportunity to persons other than the Company, and (2) shall not be liable to the Company or its Members for breach of fiduciary duty as a Member of the Company by reason of the fact that the Class D Investor or any of its Affiliates pursued or acquired such Company Opportunity for itself, directed, sold, assigned or otherwise transferred such Company Opportunity to another person, or did not communicate information regarding such Company Opportunity to the Company,

it being understood that the foregoing shall not constitute a waiver of any right the Company may have as a result of a breach of a contract between the Company and the Class D Investor or any of its Affiliates.

(b)     For the purposes of this <u>Section 11.16</u>:

(i)     "<u>Affiliate</u>" of any Person shall mean any other Person that, directly or indirectly, controls, is under common control with or is controlled by that Person; provided, however, that neither the term "Affiliate" nor the waivers and protections contained in this <u>Section 11.16</u>, shall include or extend to any Person who serves as a Director, or as an officer, or employee of the Company. For purposes of this definition, "control" (including, with its correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

(ii)     "<u>Company Opportunity</u>" shall mean an investment, development or business opportunity or prospective economic or competitive advantage in which the Company could have an interest or expectancy.

(iii)     "<u>Person</u>" shall mean an individual, corporation, partnership, limited liability company, trust, unincorporated organization, or other legal entity.

49

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

BIOCISION, LLC

By _____
ROLF O. EHRHARDT, MANAGER

[Signature Page to BioCision LLC – Amended and Restated Operating Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLASS D PREFERRED HOLDER:

BROADOAK FUND II, LLC

By: _____
WILLIAM SNIDER

Title: Manager

[Signature Page to BioCision LLC – Amended and Restated Operating Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLASS D PREFERRED HOLDER:

BROOKS AUTOMATION, INC.

By: _____

STEPHEN S. SCHWARTZ

Title: Chief Executive Officer

[Signature Page to BioCision LLC – Amended and Restated Operating Agreement]

Case: 17-31272    Doc# 124    Filed: 03/21/18    Entered: 03/21/18 12:10:21    Page 59 of
81

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLASS D PREFERRED HOLDER:

RESEARCH CORPORATION
TECHNOLOGIES, INC.

By: _____
SHAUN KIRKPATRICK

Title: President

[Signature Page to BioCision LLC – Amended and Restated Operating Agreement]

# SCHEDULE A

## CURRENT MEMBERS

Andre Adamski

Israeli Allin

Kathie Berg

Peter D. Bewley and Lee D. Bewley, Trustees of the Peter and Lee Bewley Revocable Trust dated 12/7/2004, and Successor Trustees thereunder

BroadOak Fund II, LLC

Brooks Automation, Inc.

Kenneth Clark

Tom DeZao

Ron DiNocco

DNA Ink, LLC

David Arthur Donley

Anita Douglas

Ethan Douglas

Hugh Douglas

Ian Douglas

William Douglas

Rolf O. Ehrhardt

Howard Felson

Beth Galvin

Maryann Garvey

Zvi Govrin and Dvora Govrin, TTEE The Govrin 2009 Trust

Norman B. Gusner and Gail Whang Gusner, as Trustees of the Norman B. Gusner and Gail Whang Gusner Revocable Trust

James C. Hansen

George Robert Johnson, Jr., and Aurelia DeGuzman Johnson 2011 Trust

Christer Karlsson

The Kaster Revocable Trust

Julius J.S. Knowles

David Lee

Gerardo Mariano

Isabella Mariano

Michelle Nemits

Paul Nowak

Mary O'Donovan

Sidney A. Sattler and Teri Jackson Sattler

Brian B. Schryver

Jeff E. Schryver

Philip Schulman

John Schulz

Karl Schulz

Blair Andrew Stewart

Blair W. Stewart

Syd Strong

Ramana Tadepalli

Satyavathi Tadepalli

Eliot F. Terborgh and Christine L. Terborgh, Trustees U/A/D 8/28/91

John W. Terborgh

The Torrance-Ortiz Living Trust

Robert W. Vyverberg

Lyell and Lisa Warren

Dorothy C. Weicker

Jamie Wibbenmeyer

Donald B. Worth and/or Dorothy J. Worth          WS Investment Co., LLC (2012A)

WS Investment Co., LLC (2008A)

## SCHEDULE B

OWNERSHIP INTERESTS

| Name | Class A Common Units | Class B Common Units | Class C Common Units | Class D Preferred Units |
|---|---|---|---|---|
| Andre Adamski | | **2,000** | | |
| Israeli Allin | | | **4229** | |
| Kathie Berg | | | **9,463** | |
| Peter D. Bewley and Lee D. Bewley, Trustees of the Peter and Lee Bewley Revocable Trust dated 12/7/2004, and Successor Trustees thereunder | | | **43,091** | |
| BroadOak Fund II, LLC | | | | **354,286** |
| Brooks Automation, Inc. | | | | **1,342,282** |
| Kenneth Clark | | | **756** | |
| Tom DeZao | | | **10,781** | |
| Ron DiNocco | **100,000** | | | |
| DNA Ink, LLC | | | **3,785** | |
| David Arthur Donley | | | **7,812** | |
| Anita Douglas | | | **3,785** | |
| Ethan Douglas | | | **2,839** | |
| Hugh Douglas | **100,000** | | | |

| Name | Class A Common Units | Class B Common Units | Class C Common Units | Class D Preferred Units |
|---|---|---|---|---|
| Ian Douglas | | | **10,643** | |
| William Douglas | | | **3,785** | |
| Rolf O. Ehrhardt | **850,000** | | | |
| Howard Felson | | | **15,625** **7,812** | |
| Beth Galvin | | **5,000** | | |
| Maryann Garvey | | | **10,708** | |
| Zvi Govrin and Dvora Govrin, TTEE The Govrin 2009 Trust | | | **9,463** | |
| Norman B. Gusner and Gail Whang Gusner, as Trustees of the Norman B. Gusner and Gail Whang Gusner Revocable Trust | | | **9,463** | |
| James C. Hansen | | | **15,142** | |
| George Robert Johnson, Jr., and Aurelia DeGuzman Johnson 2011 Trust | | | **9,423** **10,585** | |
| Christer Karlsson | | **15,000** | | |
| The Kaster Revocable Trust | | | **10,697** | |
| Julius J.S. Knowles | | | **10,775** | |

| Name | Class A Common Units | Class B Common Units | Class C Common Units | Class D Preferred Units |
|---|---|---|---|---|
| David Lee | | | **7,812** | |
| Gerardo Mariano | | | **20,312** | |
| Isabella Mariano | | | **7,812** | |
| Michelle Nemits | **315,000** | | | |
| Paul Nowak | **35,000** | | | |
| Mary O'Donovan | | | **37,692** | |
| Research Corporation Technologies, Inc. | | | | **265,714** |
| Sidney A. Sattler and Teri Jackson Sattler | | | **9,463** | |
| Brian B. Schryver | **600,000** | | | |
| Jeff E. Schryver | **306,771** | | | |
| Philip Schulman | | | **15,625** | |
| John Schulz | | | **8,547** | |
| Karl Schulz | | | **6,420** | |
| Blair Andrew Stewart | | | **10,692** | |
| Blair W. Stewart | **50,000** | **20,000** | | |
| Syd Strong | | | **7,812** | |
| Ramana Tadepalli | | **2,000** | | |
| Satyavathi Tadepalli | | | **10,684 31,250** | |

| Name | Class A Common Units | Class B Common Units | Class C Common Units | Class D Preferred Units |
|---|---|---|---|---|
| Eliot F. Terborgh and Christine L. Terborgh, Trustees U/A/D 8/28/91 | | | 18,927 | |
| John W. Terborgh | | | 9,463 | |
| The Torrance-Ortiz Living Trust | | | 15,625 | |
| Robert W. Vyverberg | | | 10,681 | |
| Lyell and Lisa Warren | | | 12,500 | |
| Dorothy C. Weicker | | | 147,665 31,250 | |
| Jamie Wibbenmeyer | | 31,250 | | |
| Donald B. Worth and/or Dorothy J. Worth | | | 3,125 | |
| WS Investment Co., LLC (2008A) | | | 7,134 | |
| WS Investment Co., LLC (2012A) | | | 5,653 | |
| Total | 2,356,771 | 75,250 | 646,806 | |

Excludes options for Class B Common Units

**SCHEDULE C**

<u>CAPITAL ACCOUNTS OF CLASS D HOLDERS</u>

| <u>Name</u> | <u>Capital Account</u> |
|---|---|
| BroadOak Fund II, LLC | **$1,055,719** |
| Brooks Automation, Inc. | **$4,000,000** |
| Research Corporation Technologies, Inc. | **$791,881** |

# SECOND AMENDMENT TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT

This Second Amendment to Limited Liability Company Operating Agreement (this "*Amendment*") dated as of November 28, 2016, is made by and among BIOCISION, LLC, a Delaware limited liability company (the "*Company*"), and the signatories listed on the signature pages hereto (the "*Signatory Members*"), who together have sufficient voting power to amend the Company's Limited Liability Company Operating Agreement Amended and Restated as of March 11, 2014 (the "*Operating Agreement*"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Operating Agreement.

## R E C I T A L S

**WHEREAS:** BroadOak Fund II, LLC ("**Broad Oak**") and Research Corporation Technologies, Inc. ("**RCT**") will transfer their rights and obligations under the secured subordinated term notes and secured term notes of the Company that they hold to Brooks Automation, Inc. ("**Brooks**") (BroadOak's and RCT's debt together, the "**Debt**").

**WHEREAS:** The Company will transfer certain of its assets and liabilities related to the Basic Lab Business (as such term is defined in the Company's Asset Transfer Agreement dated on or about the date hereof) to Cool Lab LLC ("**BL NewCo**").

**WHEREAS:** Brooks will acquire from the Company all of the issued and outstanding limited liability company interests in BL NewCo in exchange for (a) cancellation of the Debt and the debt held by Brooks pursuant to the secured subordinated term notes of the Company held by Brooks, (b) the redemption by the Company of all of Brooks' Class D Units in the Company and (c) other consideration as set forth in the Company's Unit Transfer Agreement dated on or about the date hereof.

**WHEREAS:** After the completion of the transactions described above (collectively, the "**Spin-Out**"), the remaining assets and liabilities of the Company will remain with the Company, and the Company plans to continue its operations under the "MedCision" name.

**WHEREAS:** As a result of the Spin-out, (a) all of the debt held of the Company held by Brooks, BroadOak and RCT will be cancelled, (b) Brooks will no longer be a member or debtholder of the Company, and (c) BroadOak and RCT will continue to hold their Class D units in the Company.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and obligations set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

**1.**     The first sentence of Section 2.2 of the Operating Agreement is hereby amended and restated to read in its entirety as follows:

> "The name under which the Company shall conduct its business is "MedCision, LLC"."

**2.**     Section 7.15(c) of the Operating Agreement is hereby amended and restated to read in its entirety as follows:

> "(c)     <u>Election of Directors</u>.  The Class A Members and any other class or series of voting units (including the Class D Members), exclusively and voting together as a single class,

shall be entitled to elect the total number of directors of the Company. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding units of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. Except as otherwise provided in this Article 7, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or series or by any remaining director or directors elected by the holders of such class or series pursuant to this Article 7."

**3.**     Section 7.16 of the Operating Agreement is hereby amended and restated to read in its entirety as follows:

"7.16   Class D Preferred Units Unit Protective Provisions.  At any time when at least 10% of the Class D Preferred Units issued on the Class D Original Issue Date (subject to appropriate adjustment in the event of any unit dividend, unit split, combination or other similar recapitalization with respect to the Class D Preferred Units) are outstanding, the Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then outstanding Class D Preferred Units, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

(a)     liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or any other Deemed Liquidation Event (as defined in Article VI), or consent to or enter into any agreement to do any of the foregoing, except if the proceeds payable to the holders of the Class D Preferred Units at the initial closing of such event exceed the aggregate Class D Liquidation Amount;

(b)     amend, alter or repeal any provision of this Agreement of the Company in a manner that adversely affects the powers, preferences or rights of the Class D Preferred Units or enter into any agreement to do the foregoing;

(c)     (i) create, or authorize the creation of, or issue or obligate itself to issue units of, any additional class or series of units unless the same ranks junior to the Class D Preferred Units with respect to the distribution of assets on the liquidation, dissolution or winding up of the Company, and payment of dividends and rights of redemption unless either (x) such issuance (or obligation to issue) is part of a bona fide financing transaction for which the primary purpose is raising capital, as reasonably determined by a non-interested majority of the Board or (y) all Additional Class D Investors are given the opportunity to participate in such transaction, (ii) increase the authorized number of Class D Preferred Units or increase the authorized number of units of any additional class or series of units unless the same ranks junior to the Class D Preferred Units with respect to the distribution of assets on the liquidation, dissolution or winding up of the Company, the payment of dividends and rights of redemption, or (iii) enter into any agreement to do the foregoing;

(d)      (i) reclassify, alter or amend any existing security of the Company that is pari passu with the Class D Preferred Units in respect of the distribution of assets on the liquidation, dissolution or winding up of the Company, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to the Class D Preferred Units in respect of any such right, preference, or privilege or (ii) reclassify, alter or amend any existing security of the Company that is junior to the Class D Preferred Units in respect of the distribution of assets on the liquidation, dissolution or winding up of the Company, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to or pari passu with the Class D Preferred Units in respect of any such right, preference or privilege or (iii) or enter into any agreement to do the foregoing;

(e)      purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any Units of the Company or enter into any agreement to do the foregoing other than (i) redemptions of or dividends or distributions on the Class D Preferred Units as expressly authorized herein, (ii) dividends or other distributions payable on the Class A Common Units solely in the form of additional Class A Common Units, (iii) repurchases of units from former employees, officers, directors, consultants or other persons who performed services for the Company or any subsidiary in connection with the cessation of such employment or service other than pursuant to the provisions of existing equity incentive plans existing on the Class D Original Issue Date or (iv) as approved by a non-interested majority of the Board;

(f)      create, or authorize the creation of, or issue, or authorize the issuance of, or guarantee or authorize the guarantee of, or endorse or otherwise become directly or contingently liable on, any debt security, or permit any subsidiary to take any such action with respect to any debt security or enter into any agreement to do the foregoing, if the aggregate indebtedness of the Company and its subsidiaries for borrowed money incurred in any year following such action would exceed $350,000;

(g)      pledge, hypothecate or create any lien, security interest in or encumbrance or enter into any agreement to do the foregoing  on (1) assets of the Company in the aggregate in excess of $350,000, other than security interests in connection with purchases made by the Company(provided that nothing in this clause (g)(1) shall be deemed to permit the Company to take any action that would otherwise be subject to Section 7.16(f) unless such action is taken in compliance therewith) or (2) any of the Company's intellectual property;

(h)      create, or hold capital stock in, any subsidiary that is not wholly owned (either directly or through one or more other subsidiaries) by the Company, or sell, transfer or otherwise dispose of any capital stock of any direct or indirect subsidiary of the Company, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or series of related transactions) of all or substantially all of the assets of such subsidiary, or enter into any agreement to do the foregoing;

(i)      sell, license, assign, transfer or otherwise dispose of, or the grant of any rights in or to, the Company's intellectual property or intellectual property rights or enter into

any agreement to do the foregoing, other than non-exclusive licenses in the ordinary course of business;

        (j)    make any material change to the principal line of business of the Company, or enter into new material lines of business or an exit from a current line of business, or enter into any agreement to do the foregoing;

        (k)    make any loan or advance to any officer, director, employee, consultant or any loan or advance in an amount of more than $100,000 individually or $200,000 per year in the aggregate to any other person, or any subsidiary or other corporation, partnership, person, individual or other entity or enter into any agreement to do the foregoing other than advances on expenses in the ordinary course of business or as approved by a non-interested majority of the Board;

        (l)    participate in, or be a party to, any transaction with any director, officer or employee of the Company or any Affiliate of any such person or enter into any agreement to do the foregoing except transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a non-interested majority of the Board;

        (m)    increase the authorized number of Class A Common Units, Class B Common Units, or Class C Common Units or enter into any agreement to do the foregoing;

        (n)    effect any dividend, unit split, combination or other similar Recapitalization (as defined in Article VI) on Class B Common Units or enter into any agreement to do the foregoing."

**4.**    Effectiveness.  This Amendment shall become effective and binding upon the Company and the Members upon its execution by the Company and the Signatory Members.

**5.**    Effect of Amendment.  Except as amended and set forth above, the Operating Agreement shall continue in full force and effect.

**6.**    Governing Law.  This Amendment shall be interpreted in accordance with and governed by the laws of the state of Delaware (without giving effect to any choice or conflict of laws provisions thereof).

**7.**    Counterparts.  This Amendment may be executed in any number of counterparts, including by facsimile, each of which shall be enforceable, and all of which together shall constitute one instrument.

*[Signature pages to follow.]*

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

BIOCISION, LLC

By    *Rolf Ehrhardt*   
ROLF O. EHRHARDT, MANAGER

[Signature Page to Biocision, LLC – Second Amendment to Amended and Restated Limited Liability Company Operating Agreement]

Case: 17-31272    Doc# 124    Filed: 03/21/18    Entered: 03/21/18 12:10:21    Page 72 of 81

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**CLASS A MEMBERS:**

_____          _10/28/16_____
RON DINOCCO                                 Date

_____          _____
HUGH DOUGLAS                                Date     _11/28/16_

_____          _____
ROLF O. EHRHARDT                           Date

_____          _____
MICHELLE NEMITS                            Date

_____          _____
PAUL J. NOWAK                              Date

_____          _____
BRIAN B. SCHRYVER                          Date

_____          _____
JEFFREY E. SCHRYVER                        Date

_____          _____
BLAIR W. STEWART                           Date

[Signature Page to Biocision, LLC – Second Amendment to Amended and Restated Limited Liability Company Operating Agreement]

Case: 17-31272    Doc# 124    Filed: 03/21/18    Entered: 03/21/18 12:10:21    Page 73 of 81

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**CLASS A MEMBERS:**

_____
RON DINOCCO                              Date

_____
HUGH DOUGLAS                        Date  11/29/16

_____
ROLF O. EHRHARDT                 Date

_____
MICHELLE NEMITS                 Date

_____
PAUL J. NOWAK                    Date

_____
BRIAN B. SCHRYVER               Date

_____
JEFFREY E. SCHRYVER            Date

_____
BLAIR W. STEWART                 Date

[Signature Page to Biocision, LLC – Second Amendment to Amended and Restated Limited Liability Company Operating Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**CLASS A MEMBERS:**

_____     _____
RON DINOCCO                     Date

_____     _____
HUGH DOUGLAS                    Date

_____     _____
ROLF O. EHRHARDT                Date

_____     _____11-30-2016._____
MICHELLE NEMITS                 Date

_____     _____
PAUL J. NOWAK                   Date

_____     _____
BRIAN B. SCHRYVER               Date

_____     _____
JEFFREY E. SCHRYVER             Date

_____     _____
BLAIR W. STEWART                Date

[Signature Page to Biocision, LLC – Second Amendment to Amended and Restated Limited Liability Company Operating Agreement]

Case: 17-31272    Doc# 124    Filed: 03/21/18    Entered: 03/21/18 12:10:21    Page 75 of 81

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**CLASS A MEMBERS:**

RON DINOCCO _____          Date _____

HUGH DOUGLAS _____          Date _____

ROLF O. EHRHARDT _____          Date _____

MICHELLE NEMITS _____          Date _____

*Paul J. Nowak*

PAUL J. NOWAK _____          Date 11/28/16

BRIAN B. SCHRYVER _____          Date _____

JEFFREY E. SCHRYVER _____          Date _____

BLAIR W. STEWART _____          Date _____

[Signature Page to Biocision, LLC – Second Amendment to Amended and Restated Limited Liability Company Operating Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**CLASS A MEMBERS:**

_____
**RON DINOCCO**

_____
**Date**

_____
**HUGH DOUGLAS**

_____
**Date**

_____
**ROLF O. EHRHARDT**

_____
**Date**

_____
**MICHELLE NEMITS**

_____
**Date**

_____
**PAUL J. NOWAK**

_____
**Date**

_____
**BRIAN B. SCHRYVER**

11/28/2015
**Date**

_____
**JEFFREY E. SCHRYVER**

_____
**Date**

_____
**BLAIR W. STEWART**

_____
**Date**



ROLF O. EHRHARDT, MANAGER

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**CLASS A MEMBERS:**

RON DINOCCO                                    Date

HUGH DOUGLAS            Date

ROLF O. EHRHARDT            Date

MICHELLE NEMITS            Date

PAUL J. NOWAK            Date

BRIAN B. SCHRYVER            Date

JEFFREY E. SCHRYVER            Date

BLAIR W. STEWART            Date

_Nov 30 2016_

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

BROADOAK FUND II, LLC

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**CLASS A MEMBERS:**

_____       _____
**RON DINOCCO**                        Date

_____       _____
**HUGH DOUGLAS**                       Date

_____       _____
**ROLF O. EHRHARDT**                   Date

_____       _____
**MICHELLE NEMITS**                    Date

_____       _____
**PAUL J. NOWAK**                      Date

_____       _____
**BRIAN B. SCHRYVER**                  Date

_____       _____
**JEFFREY E. SCHRYVER**                Date

*Blair W Stewart*                      *Nov 28, 2016*
_____       _____
**BLAIR W. STEWART**                   Date

[Signature Page to Biocision, LLC – Second Amendment to Amended and Restated Limited

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

BROADOAK FUND II, LLC

By: _____
WILLIAM SNIDER

Title: Manager

[Signature Page to Biocision, LLC – Second Amendment to Amended and Restated Limited Liability Company Operating Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

RESEARCH CORPORATION
TECHNOLOGIES, INC.

By: _____
SHAUN KIRKPATRICK

Title: President

[Signature Page to Biocision, LLC – Second Amendment to Amended and Restated Limited Liability Company Operating Agreement]